SHELDON DROBNY AND ANITA DROBNY, PETITIONERS *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

LOUIS LIFSHITZ AND RUTH LIFSHITZ, PETITIONERS *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket Nos. 16985-83, 17602-83.     Filed June 26, 1986.

*Howard L. Stone, Steven B. Nagler, David A. McGuire,* and *Fred A. Bibeau,* for the petitioners in docket No. 16985-83.

*Randall S. Goulding,* for the petitioners in docket No. 17602-83.

*Lauren W. Gore* and *William C. Sabin, Jr.,* for the respondent.

SIMPSON, *Judge*: The Commissioner determined the following deficiencies in, and addition to, the petitioners' Federal income taxes for 1979:

| Petitioners | Deficiency | Addition to tax sec. 6653(b) I.R.C. 1954[1] |
|---|---|---|
| Sheldon and Anita Drobny | $10,877 | $5,439 |
| Louis and Ruth Lifshitz | 32,052 | - - - |

The issues for decision are: (1) Whether the petitioners are entitled to deductions for their proportionate share of losses resulting from alleged research and experimental expenditures by a joint venture and a partnership in 1979; and (2) whether Mr. Drobny is liable for the addition to tax for fraud under section 6653(b) for 1979.

[1]All statutory references are to the Internal Revenue Code of 1954 as in effect during 1979, unless otherwise indicated.

FINDINGS OF FACT

Some of the facts have been stipulated, and those facts are so found.

The petitioners, Sheldon and Anita Drobny, husband and wife, maintained their legal residence in Highland Park, Illinois, at the time their petition was filed. They filed their joint Federal income tax return for 1979 with the Internal Revenue Service Center at Kansas City, Missouri. The petitioners, Louis and Ruth Lifshitz, husband and wife, maintained their legal residence in Wilmette, Illinois, at the time their petition was filed in this case. Their joint return for 1979 was filed with the Internal Revenue Service.

Twenty-two investors,[2] including Messrs. Drobny and Lifshitz, participated in two research and development investment programs, Farm Animal Product Venture (FAP) and AloEase Partnership (AloEase). Mr. Lifshitz purchased one unit, a one-twentieth interest, in each program; and Mr. Drobny purchased one-half a unit, a one-fortieth interest, in each program. FAP was a joint venture formed for the purpose of developing and marketing Pork Pardner, a medicine to be fed to farm animals, particularly hogs, for the prevention and treatment of various diseases that decrease the size of litters and adversely affect the health of small pigs. AloEase was formed for the purpose of acquiring, developing, and marketing a treatment to soothe aching or burning human eyes (AloEase product). The investors were treated as general partners in AloEase and were treated as owning FAP as tenants in common. The profits, losses, credits, and cash flow in each program were shared in relation to the investors' ownership interests.

Pork Pardner and the AloEase product were to contain aloe vera. Aloe vera is an extract from the Aloe Barbidensisi plant, of which there are approximately 270 species. Because it is thought to have medicinal, pain-killing, and healing properties, it is used in a wide range of products for humans and animals.

Isle of Aloe, Inc. (Isle), was incorporated in 1967 for the purposes of conducting research, development, and marketing of aloe vera based products. Between 1967 and 1984,

---

[2] The owners of an interest in the program who are husband and wife are considered one investor for purposes of this opinion.

Isle developed and marketed at least 35 such products. Robert White was one of the original incorporators of Isle and its president and majority shareholder in 1979 and 1980. In June 1979, he contacted Marvin Kamensky to secure funds to conduct the research, development, and marketing of Pork Pardner and the AloEase product. At the end of 1979, Isle had a $668,315 deficit in retained earnings, and in March 1981, it filed for bankruptcy under chapter 11.

Mr. Kamensky was a partner in the law firm of Kamensky & Landan (the law firm).[3] He arranged research and development tax shelters and was known in Chicago as an attorney with experience in the formation of such tax shelters. He directed and controlled the creation of all of the research and development programs at issue, the creation of all the entities involved in such program (except for Isle), and the material relationships between such entities.

Marc Z. Samotny was an associate with the law firm during 1979 and early 1980. Under the direction of Mr. Kamensky, he prepared all of the documents involved in the transactions which were a part of the programs.

Sheldon Drobny was an Internal Revenue Service agent from 1967 through 1971 and has been a Certified Public Accountant in private practice since 1971. He received the Elijah Watts Sells Award from the American Institute of Certified Public Accountants for being in the top 27 out of 19,000 people who took the CPA exam. He taught income tax accounting for a CPA review course and was an instructor for the IRS while working there, teaching basic and advanced agent training courses in the area of taxation. At all relevant times, he was a partner with Louis Adler in Adler & Drobny, Ltd. (the accounting firm). In December 1978, Messrs. Adler and Drobny promoted four research and development investment programs with a total purchase price of $1,786,000. They promoted a $1,745,000 real estate investment program in December 1977.

In November 1979, Mr. Drobny was informed by Mr. Kamensky of the Pork Pardner and AloEase product programs. Because the necessary transactions had to be completed in December, Mr. Drobny was not initially

---

[3] The law firm is now known as Kamensky & Rubinstein.

interested; however, he agreed to review information concerning both programs. In a letter dated November 28, 1979, Mr. Samotny sent Mr. Drobny an outline of the transactions for the two programs, a chart showing the flow of the funds, and a statement of the cash to be invested and the tax benefits to be derived therefrom.

On November 30, 1979, Mr. Samotny wrote to Mr. Drobny again to provide him with a "sales kit" which contained a more detailed explanation of the FAP and AloEase programs and their tax consequences. In part, the letter stated:

The individual investors will compensate Isle of Aloe in an amount equal to $800,000.00 (comprised of $160,000 in cash and $640,000 in the form of bank loans) for the research and development of the subject animal product. Upon completion of the research and development, the individual investors, acting as tenants-in-common will apply for a patent on the animal product. It is currently contemplated that such application will be made by Isle of Aloe.

\* \* \* \* \* \* \*

Isle of Aloe, Inc. will subcontract with Swain's corporation in order that it may provide the necessary research and development for the animal product. Isle of Aloe will pay Swain's corporation $750,000.00 pursuant to the subcontract for the research and development. In turn, Swain's corporation will pay to the investors on or about January 15, 1980 an advance minimum royalty equal to $750,000.00 attendant the right to commercially exploit the animal product.

Each individual investor will also be required to enter into a partnership for the exploitation of a second product. It is currently contemplated that this product will be an Isle of Aloe product to be used as an eye wash. The partnership will acquire all of Isle of Aloe's right, title and interest in and to the eye wash product. Subsequently, the partnership will enter into a research and development agreement with Isle of Aloe whereby the partnership will pay to Isle of Aloe $320,000.00 ($60,000.00 cash and $260,000.00 in the form of bank loans) to perform research and development on the product.

Isle of Aloe will, upon receipt of the $320,000.00, make a loan to a corporation to be owned and controlled by Paula Larson in the amount of $150,000.00. This corporation will in turn pay to the partnership $150,000.00 in the form of option money to have the right to commercially exploit the eye wash product. In order to exercise its option the corporation controlled by Paula Larson will also be required to pay $300,000.00 upon exercise of the option and in addition will pay the partnership group a royalty presently contemplated to be eight percent of gross sales. As you are aware, the grant of the option money to the

partnership is a non-taxable event until such time as either the option is exercised or the option period lapses.

In the materials sent by Mr. Samotny to Mr. Drobny on November 30, 1979, one sentence was devoted to describing each product, and tax and cash analyses were included. It was indicated that a purchaser of a unit would contribute $11,000 in cash, that he would borrow $45,000, and that he would claim a deduction for the entire $56,000. The 1979 net tax benefit from the programs was expected to be $17,000 per unit for investors in the 50-percent tax bracket and $28,200 for those in the 70-percent bracket. The net total tax benefit from the programs was listed as $9,500 for investors in the 50-percent bracket and $17,700 for those in the 70-percent bracket. The large 1979 benefit would arise from the investors' deduction of losses resulting from research and experimental payments to Isle of $1,120,000. In 1980, the receipt of an option payment was listed as nontaxable, but a $750,000 advance minimum royalty was expected to be taxable at the long-term capital gain rate, thereby decreasing the net tax benefit of the programs.

Shortly after receiving such letter, Messrs. Samotny and Drobny discussed the similarities between the two programs at issue and an earlier one of Mr. Kamensky's which Mr. Drobny had reviewed in August 1979; the three programs were almost identical in structure, form, and tax effects. Mr. Drobny then began soliciting investors from among his clients and associates; at least 7 of the 22 investors were his clients.

Each investment program was described and offered to the investors in its own private placement memorandum. Such memorandums require that each investor have sufficient wealth or income to enable him to withstand the loss of his investment without undue hardship. At least 10 pages in each memorandum are dedicated to explaining the tax ramifications of the program, including the deductibility of research and experimental expenditures. It is clearly stated that prior projects seeking similar tax objectives have been "set aside" in full or in part by the IRS. There is a warning that an audit by the IRS may lead to an increase in an investor's tax liability.

Messrs. Adler and Drobny are identified as the promoters of the programs and as having previously promoted research and development programs which were unsuccessful. The accounting firm is described as one "which specializes in corporate, individual, trust and partnership financial and tax consultation."

The law firm is identified as having been retained by the promoters as special counsel with respect to certain tax aspects of the programs. Following a statement that the law firm had not independently verified any of the information in the memorandum relative to any of the parties involved, each memorandum has a statement in capital letters encouraging investors to seek independent counsel concerning the merits of the program and its tax consequences. Elsewhere, it is stated that there will be no independent management for the investors and no managing investor, and that the lack thereof might make it difficult for the investors, as a group, to enforce their rights under the agreements.

The memorandums state that the law firm is to receive $17,500 for each program from Isle for drafting documents and providing tax advice and that the accounting firm is to receive $15,000 per program from Isle for accounting services. In fact, although such $30,000 was paid to the accounting firm, Mr. Drobny never examined the financial records of any corporation involved in the programs, nor did the accounting firm prepare the tax returns for any such corporation.

The memorandums contain general statements, attributed to Isle, about the marketability of the products, but no market survey data. There is no evidence that any market study was ever made. Income projections refer only to the option payment and the advance minimum royalty to be received in 1980. Visine and Murine are identified as the primary competition for the AloEase product, while American Cyanamid and Pfizer products are listed as Pork Pardner's competition. The memorandums state that each product is a conceptual idea which has not, and perhaps will not, be developed, but Isle will attempt to deliver such products by September 30, 1980. Cash and tax benefit analyses are presented for 1979 and 1980. The transactions

involved in each program are described in detail in its memorandum, except that there is no mention of any loans.

Two corporations were created in conjunction with the programs, Farm Animal Laboratories, Inc. (FAL), and Aloe Research Laboratories, Inc. (ARL). The articles of incorporation for each were prepared by the law firm. Such articles for ARL were filed with the secretary of state for Illinois on December 7, 1979. In the earlier letters, such corporation was identified as one controlled by Paula Larson, but she was not listed as an officer or director of such corporation and never acted for it. Gary Swain and Paula Larson were listed as the directors of FAL, which took the place of a corporation referred to as "Swain's" corporation in the earlier letters. On December 17, 1979, such articles for FAL were filed with the secretary of state for Iowa.

In letters dated December 14, 1979, the law firm provided additional comments to the accounting firm concerning possible tax consequences of the programs. Concerning the possibility that investors might be denied any deductions for expenditures by AloEase because it was an activity entered into solely for tax avoidance, the law firm included the following:

> Based upon the foregoing, it is conceivable that the Service could take the position that this transaction is a sham for tax avoidance purposes only, and presuming *arguendo* that the Service could ultimately prevail on this issue, then the Partnership's deductions in 1979 could be limited to the cash which was actually advanced for the research and development ($320,000.00 less the option payment of $150,000.00).
>
> The rule that the substance of a transaction, rather that [sic] its mere form, controls tax liability, is one of the most widely accepted principles under our form of taxation. Basically, "form" is a pattern or scheme, the aspect under which a thing appears as distinguished from "substance" that which underlies all outward manifestations - the realty [sic] itself. In this respect, the form of the transaction may be disregarded if it has no purposes other than reduction of taxes. *Gregory* v. *Helvering*, 298 U.S. 465 (1935). Furthermore, if a transaction is not at arm's length, the question of substance versus form is often raised in an attempt to disregard the apparent tax results. Although no cases exist directly on this point, the Service has been successful in many cases involving controlled or related taxpayers. *Crown Cork International[al] Corp.*, 4 T.C. 19, aff'd. 149 Fed [2d] 968 (4th Cir.; 1945); *Limmericks, Inc.*, 7 T.C. 1129, aff'd. 165 F.2d. 483 (5th Cir.; 1948); *Central Cuba Sugar Co.*, 16 T.C. 882, aff'd. 198 F2d. 214 (2d Cir.; 1952).

In the *Estate of Franklin* v. *Commissioner*, 544 F.2d 1045 (9th Cir.; 1976), the Court held that the failure on the part of the purchaser of real estate to demonstrate that the purchase price of the property was at least approximately equivalent to the fair market value of same resulted in the exclusion of the entire non-recourse obligation from the tax basis of the property for depreciation purposes and the disallowance of interest on the non-recourse obligation. Similarly, in Revenue Ruling 77-110, 1977-1, CB 16, the Service held that the liability on a non-recourse interest bearing note given as part of the purchase price of film distribution rights, whose value could not be shown to approximate the amount of the note, may not be included in the basis of the rights for depreciation purposes. Accordingly, if the Service were to challenge the Partnership's deduction under Code Section 174 on [a] similar theory in the light of all of the facts and circumstances, and the Partnership was not able to show that the amounts paid to Isle for research and development were approximately equal to their value, then it is possible that the Partnership could be denied a deduction for a portion of the amounts paid to Isle.

Notwithstanding the foregoing, the Courts, including the Supreme Court, have recognized that a taxpayer may legally reduce his tax liability through structuring a transaction. *U.S.* v. *Isham*, 17 Wall 496 (1873) and *Bullen* v. *Wisconsin*, 240 U.S. 625 (1916). Accordingly, this area appears to remain a factual one, in which each case must be reviewed separately to determine the realities involved.

Similar comments appeared in the letter concerning FAP.

In December 1979, Mr. Kamensky requested that the Harris Trust and Savings Bank (the bank) make loans to each investor for $45,000 per unit of investment in both programs. He assured the bank's loan officer that the loans would be repaid within 3 weeks and stated that they were part of a "tax shelter deal." He also explained to the bank officer the proposed transactions, and under the arrangement the money would not, in fact, leave the bank. The loan officer agreed to make the loans only upon Mr. Kamensky's personal assurance that the loans would promptly be repaid. However, Mr. Kamensky did not guarantee such loans, and the investors had to qualify for them.

In a letter dated December 17, 1979, to Messrs. Adler and Drobny, Mr. Samotny described all of the paper work involved in financing the programs. In order to obtain funds from the bank, a completed personal financial statement, "certificate re business loan," and an unsecured note form had to be signed by each investor. In December 1979, each investor holding one unit in each of the programs would

prepare three personal checks: a check for $40,000 to Isle for research and development of Pork Pardner; one for $16,000 to AloEase, as a capital contribution; and another, dated January 15, 1980, for $45,600 to the bank. As stated in the letter, each investor's check to the bank was a loan repayment check comprising $45,000 in principal and $600 in interest. Mr. Drobny was responsible for the collection of such checks and the other papers.

A closing meeting for the transactions involved in the two projects (the meeting) was held at the law firm on December 26, 1979. Present at such meeting were Ms. Larson; Messrs. Drobny, Kamensky, Samotny, Swain, and White; and Charles Marker. Mr. Drobny signed all relevant documents presented at such meeting as the representative of AloEase. At the meeting, Mr. White signed all relevant documents on behalf of Isle. Among such documents were the research and development agreements between FAP and Isle and between AloEase and Isle. The contract with FAP called for Isle to receive $800,000 for research and development activities concerning Pork Pardner and to deliver the results thereof on September 30, 1980. Isle was to be paid $320,000 for such services in connection with the AloEase product.

Ms. Larson was the developer of Pork Pardner. During 1978 and 1979, she conducted field tests on Pork Pardner at the direction of Mr. White. She has been a secretary to the Dean of Pharmacy at Creighton University and a supervisor for a farm management corporation; she has had no training in research and does not have a college degree. At Mr. White's request, coupled with the promise of at least $25,000 to continue research, she attended the meeting. As the secretary of FAL, she signed several documents at the meeting; she did not have an opportunity to read such documents before signing them.

At the meeting, Ms. Larson signed an acquisition agreement between herself and Stoma Laboratories, Inc. (Stoma), a corporation Mr. Drobny had promoted in 1978. She received all of Stoma's rights in the unpatented Pork Pardner in exchange for $10 and 2 percent of gross sales in excess of $3 million. At the same time, she executed an acquisition agreement transferring her rights in the product

to FAP in return for $10 and a royalty fee of 6 percent of the gross sales above $3 million.

Mr. Swain has a college degree in animal science and was a salesman of farm products at all relevant times. At Mr. White's request, he attended the meeting. Although he was nominally the president of FAL, he was not permitted to read any of the numerous documents signed by him at the meeting.

Mr. Swain and Ms. Larson signed the research and development agreement between Isle and FAL and the exclusive license agreement between FAL and FAP. Under such research agreement, Isle entered into a subcontract with FAL to perform the research and development of Pork Pardner; such product was to be delivered to Isle by September 15, 1981. The license agreement provided FAL with the exclusive right to manufacture, market, and exploit the product. In return, FAL promised to pay FAP a license fee equal to 25 percent of gross sales of the product up to $3 million and 12 percent on sales in excess of $3 million. FAL was to make an advanced royalty payment of $750,000 on January 15, 1980.

Mr. Marker is a retired pharmacist who has worked in a series of drug stores and pharmacies since 1949. While working as a pharmacist, he started a manufacturing laboratory, which primarily manufactured aloe-based products. Such endeavor was not very successful, requiring funding from his pharmacy wages. During 1979, he worked on developing the AloEase product for Mr. White, who requested that he attend the meeting.

At the meeting, Mr. Marker signed numerous documents at the direction of Messrs. White and Drobny. Among the papers signed by him was the option agreement, under which AloEase granted ARL the exclusive option to enter into an exclusive license agreement for the AloEase product in return for $150,000. The option may be exercised by the payment of $300,000 to AloEase prior to noon on December 31, 1989. No research and development agreement between ARL and Isle was ever executed. Mr. Marker did not have the opportunity to read any of the documents signed by him, and he was told that the day's activities would result

in $200,000 for his research. Additionally, he was informed that he was the president of ARL.

Mr. Marker's signature was the only authorized one for the ARL checking account, which was opened at the bank on December 13, 1979. On the same day, a checking account in the name of FAL was opened at the bank, with Ms. Larson and Mr. Swain as authorized signatories. Two weeks later, Mr. Drobny opened a checking account at the bank for AloEase. His was the sole authorized signature on such account. Mr. White opened a checking account in the name of Isle at the bank on December 27, 1979.

On December 27, 1979, the bank made the requested loans to the investors and, in return, received a promissory note from each investor designating January 16, 1980, as the due date. Also on December 27, 1979, the proceeds of the bank loans were credited to the Isle account at the bank, $640,000, and to the AloEase account at the bank, $260,000. Such proceeds were disbursed without any authorization by the investors. As anticipated, $220,000 in cash was collected from the investors; $160,000 was deposited in the Isle account and $60,000 in the AloEase account.

On December 27, 1979, $320,000 was transferred by debit memo from the AloEase account to the Isle account. On the same day, the bank debited the Isle account $750,000 pursuant to a check drawn by Mr. White and payable to FAL, and $150,000 pursuant to a check drawn by Mr. White and payable to ARL. Neither Ms. Larson nor Mr. Swain was aware of the checks to FAL; nor was Mr. Marker aware that ARL had received a check from Isle. On or after December 27, 1979, the bank debited the Isle account $35,000 pursuant to two checks payable to the law firm, $30,000 arising from two checks payable to the accounting firm, $10,000 to a second law firm, and $144,100 pursuant to a check payable to Isle; all such checks were drawn by Mr. White.

On December 27, 1979, the bank debited the FAL account $750,000 pursuant to the instructions of Mr. Kamensky. Such funds were applied to the purchase of commercial paper in the name of FAL. The $750,000 purchase was without the knowing authorization of Ms. Larson or Mr. Swain.

A loan from Isle to ARL was part of the series of transactions involved in the program for the development of the AloEase product; a judgment note evidencing the loan was signed by Mr. Marker without his knowledge of its contents or of the loan. Such loan was made by means of the $150,000 check from Isle which was deposited on December 27, 1979, in the ARL account at the bank. The loan was not described in the private placement memorandum relating to the program. Repayment of such loan has not been made and has not been sought.

Pursuant to the instructions of Mr. Kamensky, the bank, on December 27, 1979, debited the ARL account $150,000 and purchased commercial paper in the name of ARL from the bank for such amount. The purchase of such commercial paper was made without the authorization of Mr. Marker.

On January 14, 1980, the FAL and ARL commercial paper matured. The FAL account was credited $755,020.88, principal and interest. The ARL account was credited $151,004.18, principal and interest. On the same day, $750,000 was debited from the FAL account and $150,000 was debited from the ARL account. Mr. Marker was not aware of the credit to the ARL account, and at trial, could not recall the debit to such account. Pursuant to the directions of Mr. Kamensky, such funds were combined and distributed to the 22 investors in the form of cashiers' checks payable to each of the investors in the amount of his bank loan. Such checks were deposited in the checking accounts of the investors by Mr. Drobny, and the proceeds were used to pay the principal of such loans. At the direction of Mr. Kamensky, the interest earned on the commercial paper was distributed to the investors by means of checks signed by Ms. Larson. From January 24 to February 19, 1980, Mr. Samotny forwarded to the bank investors' checks in payment of the interest due on their loans.

An outline of the research and development necessary to develop Pork Pardner was prepared by Elars Bioresearch Laboratories (Elars) for FAL in 1980 and 1981. Elars is an independent research organization specializing in safety and efficacy studies of drugs and vaccines for animal use. Very limited field testing of Pork Pardner by FAL took place during 1980. However, according to Elars, it would have

cost a minimum of $1 million to conduct proper testing and secure the Government approvals necessary to market Pork Pardner. FAL received approximately $13,000 from Isle in 1980 and 1981 for testing and research. In the spring of 1981, because of the insufficiency of funds, Ms. Larson stopped work on Pork Pardner and began work on developing an external animal medication using an aloe extract. In 1982, such a product was developed and marketed by FAL.

No laboratory work or testing was ever carried out on the AloEase product. Mr. Marker traveled to the Caribbean in 1980 and secured 22,000 gallons of aloe extract. From time to time, he was reimbursed by Mr. White for his expenses, but in May 1981, he disassociated himself from ARL because Mr. White had not honored the contracts for aloe extract negotiated by Mr. Marker, had not paid him for his services, and had not reimbursed him for money advanced by him in the pursuit of aloe extract.

On their income tax returns for 1979, the petitioners deducted the following amounts as their pro rata share of losses resulting from the programs:

| Petitioners | AloEase | FAP |
|---|---|---|
| Mr. and Mrs. Drobny | $7,990 | $19,998 |
| Mr. and Mrs. Lifshitz | 15,980 | 39,996 |

In the notices of deficiency, the Commissioner disallowed the claimed losses in full and determined that Mr. Drobny is liable for the addition to tax for fraud under section 6653(b).

OPINION

The case before the Court is representative of cases arising from two research and development programs. Except for the addition to tax for fraud sought against Mr. Drobny, all of the cases arising from these programs are factually identical, and the remaining docketed cases have agreed to be bound by the determination reached in this case.

The first issue for decision is whether the petitioners are entitled to deductions for their proportionate share of losses resulting from claimed research and experimental expenditures by AloEase and FAP for 1979. Section 174(a)(1) states,

as a general rule, that "research or experimental expenditures which are paid or incurred by * * * [a taxpayer] during the taxable year in connection with his trade or business," may, at the election of the taxpayer, be treated as expenses not chargeable to capital account and, therefore, may be deducted in the taxable year. The provisions of section 174(a)(1) "apply not only to costs paid or incurred by the taxpayer for research or experimentation undertaken directly by him but also to expenditures paid or incurred for research or experimentation carried on in his behalf by another person or organization (such as a research institute, foundation, engineering company, or similar contractor)." Sec. 1.174-2 (a)(2), Income Tax Regs.

A taxpayer need not currently be producing or selling any product in order to obtain a deduction for research and experimental expenditures. *Snow v. Commissioner*, 416 U.S. 500 (1974), revg. 482 F.2d 1029 (6th Cir. 1973), affg. 58 T.C. 585 (1972). As we observed in *Green v. Commissioner*, 83 T.C. 667, 686-687 (1984), "For section 174 to apply, the taxpayer must still be engaged in a trade or business *at some time*, and we must still determine, through an examination of the facts of each case, whether the taxpayer's activities in connection with a product are sufficiently substantial and regular to constitute a trade or business for purposes of such section." (Fn. ref. omitted; emphasis in original.)

It is well settled that to constitute a trade or business, the activity must be engaged in with an "actual and honest objective of making a profit." *Hirsch v. Commissioner*, 315 F.2d 731, 736 (9th Cir. 1963), affg. a Memorandum Opinion of this Court; *Green v. Commissioner*, 83 T.C. 667, 686-687 (1984); *Flowers v. Commissioner*, 80 T.C. 914, 931 (1983); *Siegel v. Commissioner*, 78 T.C. 659, 699 (1982); *Dreicer v. Commissioner*, 78 T.C. 642, 646 (1982), affd. without opinion 702 F.2d 1205 (D.C. Cir. 1983); *Golanty v. Commissioner*, 72 T.C. 411, 425 (1979), affd. without published opinion 647 F.2d 170 (9th Cir. 1981); *Allen v. Commissioner*, 72 T.C. 28, 33 (1979); *Dunn v. Commissioner*, 70 T.C. 715, 720 (1978), affd. 615 F.2d 578 (2d Cir. 1980); *Churchman v. Commissioner*, 68 T.C. 696, 701 (1977); *Jasionowski v. Commissioner*, 66 T.C. 312, 319 (1976); *Benz v. Commissioner*, 63

T.C. 375, 383 (1974); *Bessenyey v. Commissioner*, 45 T.C. 261, 274 (1965), affd. 379 F.2d 252 (2d Cir. 1967). Although a reasonable expectation of profit is not required, the taxpayer must have the intent and objective of realizing a profit. *Hirsch v. Commissioner*, 315 F.2d at 736; *Brannen v. Commissioner*, 78 T.C. 471, 506 (1982), affd. 722 F.2d 695 (11th Cir. 1984); *Dreicer v. Commissioner*, 78 T.C. at 644-645; sec. 1.183-2(a), Income Tax Regs. "Profit" in this context means economic profit, independent of tax savings. *Beck v. Commissioner*, 85 T.C. 557 (1985); *Herrick v. Commissioner*, 85 T.C. 237, 254-255 (1985); *Surloff v. Commissioner*, 81 T.C. 210, 233 (1983).

The issue of whether a taxpayer engages in an activity with the requisite intention of making a profit is one of fact to be resolved on the basis of all the facts and circumstances of the case. *Hirsch v. Commissioner*, 315 F.2d at 737; *Dreicer v. Commissioner*, 78 T.C. at 645; *Golanty v. Commissioner*, 72 T.C. at 426; *Allen v. Commissioner*, 72 T.C. at 34; *Dunn v. Commissioner*, 70 T.C. at 720. In making this determination, more weight must be given to the objective facts than to the taxpayer's mere after-the-fact statements of intent. Sec. 1.183-2(a), Income Tax Regs.; *Thomas v. Commissioner*, 84 T.C. 1244, 1269 (1985), on appeal (4th Cir., Sept. 13, 1985); *Engdahl v. Commissioner*, 72 T.C. 659, 666 (1979); *Churchman v. Commissioner*, 68 T.C. at 701. The petitioners bear the burden of proving that they possessed the required profit objective. Rule 142(a), Tax Court Rules of Practice and Procedure[4]; see also *Boyer v. Commissioner*, 69 T.C. 521, 537 (1977); *Johnson v. Commissioner*, 59 T.C. 791, 813 (1973), affd. 495 F.2d 1079 (6th Cir. 1974); *Sabelis v. Commissioner*, 37 T.C. 1058, 1062 (1962). The existence of the required profit objective is usually determined by the objective of the entity which has control over the activity under scrutiny. *Brannen v. Commissioner*, 78 T.C. at 504-505; cf. *Resnik v. Commissioner*, 66 T.C. 74, 80-82 (1976). Thus, the existence of a profit objective of a partnership is determined at the partnership level. *Rosenfeld v. Commissioner*, 82 T.C. 105, 112 (1984); *Brannen v. Commissioner*, 78 T.C. at 504-505; *Goodwin v. Commissioner*, 75 T.C. 424, 434-439 (1980). Such analysis is

---

[4] Any reference to a Rule is to the Tax Court Rules of Practice and Procedure.

appropriate because each partner is really engaged in the business of his partnership and, therefore, it is the partnership which exercises control over the activity under scrutiny. *Brannen v. Commissioner*, 78 T.C. at 504-505; *Butler v. Commissioner*, 36 T.C. 1097, 1106-1107 (1961). For similar reasons, the existence of a profit objective of a joint venture is generally determined at the joint venture level. See *Brannen v. Commissioner*, 78 T.C. at 501-505; *Madison Gas & Electric Co. v. Commissioner*, 72 T.C. 521, 557-565 (1979), affd. 633 F.2d 512 (7th Cir. 1980); *Grove v. Commissioner*, 54 T.C. 799, 801-805 (1970).

Section 1.183-2(b), Income Tax Regs., sets forth some of the relevant factors, derived principally from prior case law, which are to be considered in determining whether an activity is engaged in for profit. *Boyer v. Commissioner*, 69 T.C. at 537; *Benz v. Commissioner*, 63 T.C. at 382-383. Such factors include: (1) The manner in which the taxpayer carried on the activity; (2) the expertise of the taxpayer or his advisors; (3) the time and effort expended by the taxpayer in carrying on the activity; (4) the expectation that assets used in the activity may appreciate in value; (5) the success of the taxpayer in carrying on other similar or dissimilar activities; (6) the taxpayer's history of income or loss with respect to the activity; (7) the amount of occasional profit, if any, which is earned; (8) the financial status of the taxpayer; and (9) whether elements of personal pleasure or recreation are involved. *Allen v. Commissioner*, 72 T.C. at 33-34.

The petitioners contend that FAP and AloEase had the requisite profit objective because both operated with the bona fide purpose of developing and marketing aloe-based products.[5] In support of such contention, they argue that FAP and AloEase contracted for the research and development work to be performed by persons with experience in such activities and in whom they reasonably had confidence, and proper arrangements were made concerning the com-

---

[5] Mr. Lifshitz asserts that the question of profit objective should be stricken because it was raised by the Commissioner for the first time in his brief in answer. We disagree because such matter was raised in the notice of deficiency and addressed in Mr. Lifshitz's petition, his testimony at trial, and his opening brief. *Fox Chevrolet, Inc. v. Commissioner*, 76 T.C. 708, 733-736 (1981); *Estate of Horvath v. Commissioner*, 59 T.C. 551, 554-557 (1973); *Rubin v. Commissioner*, 56 T.C. 1155, 1162-1164 (1971), affd. per curiam 460 F.2d 1216 (2d Cir. 1972).

mercial exploitation of such products. However, after careful consideration of all the facts in this case, we conclude that the investment programs entered into by the petitioners were primarily intended to produce tax savings without any significant likelihood of an economic profit.

The investors were provided with very little information about the products to be developed. The offering memorandums for FAP and AloEase contained only a few paragraphs describing their products; by contrast, over 10 pages were devoted to describing the tax consequences of each program. A detailed tax opinion letter was prepared by the law firm, and no survey concerning the marketability of the products was performed, despite the known existence of established competition. Clearly, more resources were devoted to predicting tax consequences than marketing projections.

The programs were carried on in an unbusinesslike manner. While numerous documents were signed, not one was the product of arm's-length negotiation. Indeed, Ms. Larson and Messrs. Marker and Swain, who signed many documents on behalf of ARL and FAL, were not permitted to read such documents and, generally, executed them without any knowledge of their terms. As a result of such ignorance, Mr. Kamensky was able to create a paper trail of transactions for the proceeds of the bank loans, giving the appearance of a series of bona fide business transactions, without losing control over such proceeds. Such control was absolute; the bank provided him with the proceeds of the investors' loans without investor authorization and it purchased $900,000 of commercial paper in the name of ARL and FAL at his direction without the authorization or knowledge of Ms. Larson or Messrs. Marker and Swain.

Particularly disturbing is the lack of any coordinated management power on the part of the investors. Such deficiency was plainly stated in both memorandums along with a warning that it might lead to difficulties in enforcing contracts. Such intentional lack of management clearly indicates that investors were not concerned with enforcing the terms of the various contracts involved in the programs and that the programs were not instituted with a profit objective. When that deficiency is combined with the

absolute power held by Mr. Kamensky, the inference is compelling that the investors were simply purchasing tax benefits, and not interests in bona fide research and development programs.

The transactions between ARL and Isle were conducted in an unbusinesslike manner. A contract between the corporations was never signed, indicating that its terms were not important despite the contention that $320,000 was to be spent on AloEase product research. Without regard to the lack of a contract or any corporate assets for collateral, Isle made a $150,000 loan to ARL, without Mr. Marker's knowledge. The loan proceeds were used to make the option payment to AloEase, without Mr. Marker's knowledge, and no attempt has ever been made to collect upon such loan. We conclude that under the AloEase program, neither Isle nor ARL was intended to perform meaningful research and that the loan to ARL and the option payment to AloEase were simply a means of completing a series of paper transactions which were without substance and were designed to produce substantial tax benefits.

The transactions between FAL and Isle also were conducted in an unbusinesslike manner. The agreement between such corporations required FAL to develop Pork Pardner by September 15, 1981, while Isle had agreed with FAP to deliver such product on September 30, 1980. Discrepancies in both the day and year of product delivery, which made Isle's failure to perform very likely, would certainly have been detected by either of the two attorneys or Mr. Drobny if such terms were meaningful. That performance dates were not meaningful supports the conclusion that the purpose of the programs was the production of tax benefits.

The acquisition agreement executed between Stoma and Ms. Larson provided the appearance of a bona fide business transaction but was totally unnecessary. Ms. Larson, under Mr. White's direction, was working on Pork Pardner in 1978 and 1979. It had not been patented, and there is no evidence that Stoma or anyone else was engaged in similar research. The fact that Stoma was promoted by Mr. Drobny adds support to our conclusion that such agreement is

without substance and is indicative of a consistent pattern of deception surrounding the programs.

The individuals assigned the responsibility of performing the research did not have the expertise necessary to properly carry out such research. While Mr. White did have substantial relevant experience, he was not an active researcher for the programs. Ms. Larson was a former secretary and a supervisor, Mr. Marker was a retired pharmacist, and Mr. Swain was a salesman. Each of them had an interest in aloe-based products but did not have the training or history of successful product development that would reasonably warrant entrusting investors' money where there was no managing investor. In fact, Isle's large accumulated deficit indicates that Mr. White's abilities were limited and his motive survival rather than new product development.

In sharp contrast with the individuals involved in research and development, exceptionally capable tax experts were actively involved in both programs. Messrs. Adler and Drobny were both former IRS employees who had become CPAs. Both had been instructors for the IRS and a CPA review course. Additionally, they specialized in tax matters. Mr. Kamensky had structured similar tax shelter transactions and was known in Chicago as an attorney with experience in the formation of research and development tax shelters. The tax personnel were clearly far superior to the research and development staff, supporting an inference that the tax consequences were the primary objective of the programs.

Most significant is the fact that very little money was actually spent on research and development work. After the circular flow of the $900,000 proceeds of the bank loans, the investors supplied only $220,000 of actual cash for the programs. After the payment of fees to the law firm and the accounting firm, only $145,000 was available for research and development. Such amount is substantially less than the $1 million necessary to gain the required Government approvals for Pork Pardner, indicating that there was no genuine intent to develop the product.

The transactions surrounding the circular flow of the $900,000 proceeds of the bank loans had no substance for

tax purposes. The $800,000 payment to Isle by FAP, the $750,000 payment by Isle to FAL, and the $750,000 royalty payment from FAL to FAP constituted nothing more than a circular series of transactions. Similarly, the $320,000 payment to Isle by AloEase, the loan from Isle to ARL of $150,000, and the payment by ARL to AloEase of $150,000 were circular transactions. The transactions took place on paper only, were carried out in 1 day, and had the effect of increasing, for tax purposes only, the cost of services purchased from Isle to 5 times the actual cost; no part of the $900,000 was used for research and development.

The investors were practically guaranteed that the proceeds of the bank loans would be available to satisfy such loans. The control retained by Mr. Kamensky over the proceeds insured that the investors would not have any out-of-pocket expense for the loan principal. The bank loans totaling $900,000 were followed immediately by a series of paper transactions and by the purchase of commercial paper for such amount at the bank. The commercial paper came due on January 14, 1980, and the proceeds were immediately distributed to the investors, so that they were available to satisfy the bank loans which came due on January 16, 1980. The funds never left the bank; indeed, in December 1979, the bank had post-dated checks from each investor in the amount of his loan and interest.

The petitioners argue that because the commercial paper was purchased in the name of ARL and FAL, either entity could have prevented the investors from receiving such funds. This argument is meritless because both corporations were controlled by Mr. Kamensky, either directly or through Mr. White, and Ms. Larson and Messrs. Marker and Swain had no knowledge of the underlying transactions or the existence of the commercial paper; while in theory such interference might have occurred, it was realistically impossible. Therefore, we conclude that the transactions that resulted in the circular flow of the $900,000 proceeds of the bank loans were shams entered into solely to create the illusion of research and experimental expenditures, while in substance insuring that no part of such funds would be so used. Cf. *Karme v. Commissioner*, 73 T.C. 1163, 1185-1195 (1980), affd. 673 F.2d 1062 (9th Cir. 1982); *Bridges v.*

*Commissioner*, 39 T.C. 1064, 1076-1077 (1963), affd. 325 F.2d 180 (4th Cir. 1963).

In the unlikely event that a product was developed, the intricate network of agreements engineered by Mr. Kamensky insured that any profits to AloEase or FAP would be minimal. Under the exclusive license agreement between FAL and FAP, the investors received no royalties beyond the $750,000 advanced minimum royalty until sales reached $3 million. FAP was to receive a license fee of 25 percent of gross sales up to $3 million, with such license fee to be offset against the advanced minimum royalty. For sales of $3 million or more, FAP was to receive a 12-percent fee. At the same time, for sales over $3 million, FAP was to pay Ms. Larson a 6-percent fee. Because the advanced minimum royalty was merely a means of achieving a circular flow of $750,000 of the proceeds of the bank loans, the investors could not receive an economic return on their investment in Pork Pardner until sales reached $3 million, and then the net would only be 6 percent of gross sales. Such a return, where the product research is severely underfunded, thereby making product development unlikely, is so small as to allow the inference that there was no profit objective.

ARL paid $150,000 for the option agreement with AloEase; such transaction was merely a circular flow of the proceeds of the bank loans and did not represent an economic return on investment. To exercise the option, ARL had to pay an additional $300,000. If the option was not exercised, there could be no marketing or sales of the AloEase product for 10 years. The exercise of such option was highly unlikely because ARL was a new corporation created solely for the AloEase program with no assets and a $150,000 debt to Isle. It had no written contract with Isle and had no prospects of ever earning or borrowing $300,000.

Finally, the absence of any marketing projections or estimates of revenue from goods sold is one further indication that the programs had no profit objective. As the petitioners properly point out, sales estimates for new products may not be very reliable. However, the absence of any effort to ascertain whether the investors would receive

a return on their $220,000 investment indicates they were purchasing tax benefits.

The petitioners point to Ms. Larson's activities in developing an external animal medication and Mr. Marker's search for a source of aloe extract as indicators that the projects had a profit objective. However, these activities were not caused by changed circumstances and, therefore, could have been described in the placement memorandums. Yet, the activities are not described in the memorandums, and we are convinced that they were in no way contemplated by the investors or the promoters. Rather, they arose from the interest of Ms. Larson and Messrs. Marker and White in aloe-based medications in general and as such do not reflect on the two programs or the investors.

Mr. Drobny's testimony that as of 1984 he had actually lost $425, including tax savings, as a result of investing in the programs does not indicate a profit objective. We observe that such claim is not substantiated and that such a loss would not be relevant to his motive in 1979 because it is a small dollar amount and is remote in time. Mr. Lifshitz's assertion that he expected a cash flow from the programs in excess of 8 percent is also not persuasive. In the late 1970's, the aloe vera based product market was expanding; however, given the structure of these programs, such an expectation would have been pure fantasy. The self-serving nature of such claim, combined with the absence of any evidence in support, renders it implausible.

Because we find for the Commissioner on the profit objective issue, we do not address the alternative positions advanced by him.

The second issue for decision is whether Mr. Drobny is liable for the addition to tax for fraud under section 6653(b) for 1979. Such section provides that if any part of any underpayment of tax required to be shown on a return is due to fraud, there shall be added to such tax an amount equal to 50 percent of the underpayment. The Commissioner has the burden of proving, by clear and convincing evidence, that some part of the underpayment for such year was due to fraud. Sec. 7454(a); Rule 142(b); *Levinson v. United States*, 496 F.2d 651 (3d Cir. 1974); *Otsuki v. Commissioner*, 53 T.C. 96, 105 (1969). To establish fraud,

the Commissioner must show that the petitioner intended to evade taxes which he knew or believed that he owed, by conduct intended to conceal, mislead, or otherwise prevent the collection of such taxes. *Webb v. Commissioner*, 394 F.2d 366, 377-378 (5th Cir. 1968), affg. a Memorandum Opinion of this Court; *Powell v. Granquist*, 252 F.2d 56, 60 (9th Cir. 1958); *Acker v. Commissioner*, 26 T.C. 107, 111-112 (1956). It is well settled that a fraudulent understatement of income can be accomplished by means of an overstatement of deductions. *Hicks Co. v. Commissioner*, 56 T.C. 982, 1019 (1971), affd. 470 F.2d 87 (1st Cir. 1972); *Neaderland v. Commissioner*, 52 T.C. 532, 540 (1969), affd. 424 F.2d 639 (2d Cir. 1970).

The presence or absence of fraud is a factual question to be determined by an examination of the entire record. *Gajewski v. Commissioner*, 67 T.C. 181, 199 (1976), affd. without published opinion 578 F.2d 1383 (8th Cir. 1978). Fraud will never be presumed. *Beaver v. Commissioner*, 55 T.C. 85, 92 (1970). However, fraud may be proved by circumstantial evidence since direct proof of the petitioner's intent is rarely available. His entire course of conduct can often be relied on to establish the requisite fraudulent intent. *Stone v. Commissioner*, 56 T.C. 213, 223-224 (1971); *Otsuki v. Commissioner*, 53 T.C. at 105-106. When a claim of ignorance or honest mistake is set forth, this Court must consider the petitioner's intelligence, education, and tax expertise in making its determination. *Iley v. Commissioner*, 19 T.C. 631, 635 (1952).[6]

We have already held that the deductions claimed by Mr. Drobny for losses attributable to FAP and AloEase were not allowable, and the claiming of such deductions resulted in an underpayment of his tax for 1979. Therefore, the only remaining inquiry concerns the willfulness of his acts. The evidence convincingly establishes that he fraudulently underpaid his taxes for the year 1979.

There is considerable evidence to show Mr. Drobny's fraud. He is an intelligent and educated man, who is an experienced tax specialist. He was aware of all the transac-

---

[6] See *Toussaint v. Commissioner*, T.C. Memo. 1984-25, affd. 743 F.2d 309 (5th Cir. 1984); *Green v. Commissioner*, T.C. Memo. 1981-577; *Schwartz v. Commissioner*, T.C. Memo. 1974-245; *Langois v. Commissioner*, T.C. Memo. 1955-56.

tions which constituted the FAP and AloEase programs. The letter from the law firm dated November 28, 1979, set forth the financial aspects of the programs including: flow charts, descriptions of the transactions, a tax benefit analysis, and a cash flow analysis. The placement memorandums concerning the programs described important elements of such programs.

Mr. Drobny was aware of the law regarding taxes, in general, and research and experimental expenditure deductions, in particular. His knowledge as a tax specialist was supplemented by information appearing in the tax opinion letters. Such letters state that substance over form controls tax liability and that the form of a transaction may be disregarded if it has no purpose other than reduction of taxes. The lack of arm's-length transactions is identified as frequently giving rise to the use of the substance-over-form rule to disregard the form of the transaction. Finally, the law firm points out that if it cannot be shown that the amount paid to Isle is approximately equal to the value of services rendered, such amounts might not be deductible.

With the information available to him and with his understanding of such affairs, Mr. Drobny knew that very little of the money could in fact be used for research work. Under the two programs, total deductions of $1,120,000 were claimed, but the $900,000 borrowed from the bank was repaid within a month. Of the total, not more that $220,000 was available for research, but in fact, $75,000 was paid as legal fees and accounting fees. Thus, only $145,000 could be spent for research. Some of the investors may not have understood these facts, but the conclusion is inescapable that Mr. Drobny knew that the funds for which he claimed deductions would not in fact be used for research. In his case, he purchased only a one-half unit; thus, he put up $5,500 and claimed a deduction of $27,988; yet, he knew that most of that amount could not be used for research purposes.

Mr. Drobny argues that he reasonably believed the deductions were legitimate. In support of such contention, he says that he reasonably relied on the expertise of the law firm and the fact that similar programs structured by Mr. Kamensky had not been challenged by the Commissioner.

Mr. Drobny is a tax expert and promoter of considerable experience. He was aware that the law firm was receiving $35,000 for its efforts in support of the programs and, therefore, had an interest in securing a positive investor response. Mr. Drobny knew of those circumstances, and with that knowledge and his sophistication, he cannot claim to have relied upon the expertise of the law firm. Indeed, the placement memorandums state in capital letters that investors should seek independent counsel concerning the tax consequences of the programs. Finally, we do not believe that a person of Mr. Drobny's experience, including 4 years at the IRS, could reasonably have relied upon lack of action by the Commissioner as a basis for determining the legitimacy of the programs when he had detailed knowledge of the use of the proceeds of the bank loans.

Mr. Drobny states that based on past business experience with Isle and Mr. White, he reasonably believed that the contracts would be completed. Such contention is not believable because he knew that the research and development activities had been subcontracted to ARL and FAL, neither of which had a financial existence apart from the programs, and that only $145,000 would be available for such activities. Additionally, product development would not have changed the tax consequences of the circular flow of the loan proceeds and would very likely not have produced an economic profit to the investors.

Also, Mr. Drobny contends that he did not prepare any of the documents or financial data that were used in the programs and, therefore, did not commit fraud. The preparation of such documents is not required to prove fraud; knowing participation is sufficient.

We conclude that this evidence, taken as a whole, clearly and convincingly indicates that Mr. Drobny knew that some or all of the research and experimental expenditures arising from the programs were not deductible and that he intentionally reported losses resulting from such claimed deductions on his 1979 income tax return, resulting in a fraudulent underpayment of tax.

*Decisions will be entered for the respondent.*