RICHARD E. DONOVAN, Petitioner v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Donovan v. Commissioner
Docket No. 5336-88
United States Tax Court
T.C. Memo 1990-373; 1990 Tax Ct. Memo LEXIS 391; 60 T.C.M. (CCH) 184; T.C.M. (RIA) 90373; July 23, 1990, Filed *391 Decision will be entered under Rule 155. Steven J. Stanwyck and Tad R. Callister, for the petitioner. Marilyn Devin, for the respondent. COHEN, Judge. COHEN
MEMORANDUM FINDINGS OF FACT AND OPINION Respondent determined deficiencies in and additions to petitioner's Federal income tax as follows: Additions to Tax
Sec.
Sec.
Sec.
Sec.
Year
Deficiency
6653(a)(1)
6653(a)(2)
6659
6661
1983
$   456,315.50
$ 22,815.78
*
$ 683.40
$ 116,634.38
1984
1,051,339.50
52,566.98
*
882.30
265,224.75
Respondent has conceded the section 6659 additions to tax. Unless otherwise indicated, all section references are to the Internal Revenue Code, as amended and in effect for the years in issue. After concessions by the parties, the issues for decision are (1) whether petitioner is entitled to deduct amounts purportedly paid to appease disgruntled investors; and (2) whether petitioner is liable for the additions to tax under sections 6653(a) and 6661. FINDINGS OF FACT Some of the facts have been stipulated, and the facts set forth in the stipulations are incorporated in our findings by this reference. Richard E. Donovan (petitioner) resided in California at the time the petition *392 in this case was filed. During 1984, petitioner's income was derived from syndicating and marketing financial products and services, including sales of insurance, real estate, and partnership interests. In 1984, petitioner had 11,000 investor clients. Petitioner conducted business under the names of Financial Dynamics and Dynamic Equities. Sierra Realty (Sierra) was a real estate firm that sold trust deeds. From early 1981 to 1983, Sierra sold trust deeds at inflated interest rates, capitalizing on the economy at that time. Petitioner had no financial interest in Sierra, but he placed funds of several hundred investors in Sierra projects. Petitioner's clients owned second trust deeds on properties owned by Sierra. In 1983, Sierra was taken over by the California Department of Corporations and thereafter ceased to exist. The properties owned by Sierra were liquidated, and petitioner's clients suffered losses. Financial Dimensions, Inc. (Financial Dimensions), was a California corporation engaged in "factoring." Factoring, in this context, involved collecting funds from investors and distributing the funds to an accounting firm, Mahoney, Trocki and Associates, Inc. (MTA), in order *393 for MTA to purchase discounted accounts receivable. Petitioner placed funds of several hundred investors in Financial Dimensions. Financial Dimensions paid the investors a 2-percent return per month. Petitioner received a fee each time petitioner's investors received interest payments. In 1984, petitioner had $ 20,000 of fee income from Financial Dimensions. On May 25, 1984, MTA petitioned for relief under Chapter 11 in the United States Bankruptcy Court for the Southern District of California. In 1984, when Financial Dimensions stopped paying the investors their monthly interest, there were approximately 700 to 800 investors. As a result, petitioner was inundated with client complaints. In order to accommodate the large number of complaints, petitioner created a separate "client service department" with three full-time workers who answered client inquiries and complaints. On November 11, 1984, petitioner met with 40 to 50 of the 700 to 800 Financial Dimensions investors. At that meeting, petitioner attempted to inform the investors of current developments with respect to Financial Dimensions, MTA, and the bankruptcy. The meeting was recorded on an audio cassette tape and was *394 later transcribed. During that meeting petitioner described the distinction between the various types of bankruptcy, the effect of those provisions on Financial Dimensions, and the individual investors. Neither petitioner nor the audience expressed concern over the bankruptcy of Financial Dimensions. Petitioner assured the audience that he would be successful in recouping some of their investment, because he had been successful in doing so with previous investment projects that had culminated in bankruptcy. Five other similar meetings were held. In response to the complaints of the investors, petitioner wrote checks to various investors who had lost money in Sierra, Financial Dimensions, and other investments controlled by petitioner. On the advice of his attorney, petitioner had the investors execute an assignment of their rights in the failed investments to petitioner. Nearly all of the assignments were handwritten and contained similar language as follows: I hereby assign my account # in the amount of $ held by Financial Dimensions, Inc. to Richard E. Donovan. I receive as consideration for this assignment, a $ share in a Wind Dynamics Program.
The assignments were dated and *395 signed by the investors. The investors thereafter endorsed the checks received from petitioner and deposited those funds, along with their own funds, in new partnerships, named Wind Dynamics, that were controlled by petitioner. In 1984, there were four Wind Dynamics partnerships, numbers VII, XIV, XV, and XVI. On a "Fictitious Business Name Statement" filed by petitioner, petitioner signed his name as general partner of Wind Dynamics VII, Ltd.; Wind Dynamics XIV, Ltd.; Wind Dynamics XV; and Wind Dynamics XVI. Petitioner controlled all of the funds in the Wind Dynamics partnerships, he signed all of the checks, and all of the partnerships used the same bank. The partnerships' address was the same as petitioners' address in a building owned by petitioner. On November 29, 1984, petitioner withdrew $ 172,000 from his money market account at Wells Fargo Bank and deposited a cashier's check for the same amount into the Wells Fargo Bank account of Wind Dynamics VII, Ltd. The $ 172,000 was used to purchase additional wind turbines from Airtricity Corporation (Airtricity). The total purchase price of the wind turbines was $ 780,000; petitioner paid $ 829,000. Airtricity then refunded *396 the $ 49,000 overpayment to petitioner, and petitioner reported that amount as income in 1984. OPINION Respondent determined that petitioner had $ 1,808,090 in unreported Schedule C commission income from Airtricity. Petitioner concedes that that amount represents unreported income but contends that he incurred $ 1,088,002 in expenses that offset respondent's determination. Petitioner contends that he paid (1) $ 172,000 to purchase additional wind turbines to ensure that the Wind Dynamics partnerships would be profitable; and (2) $ 916,002 to disgruntled investors in order to appease them and prevent them from suing him for losses they sustained in their investments with petitioner. Petitioner bears the burden of proof with respect to the issues in this case. Rule 142(a), Tax Court Rules of Practice and Procedure.
Petitioner initially argues that the purchase of the wind turbines was necessary (1) to enable the partnerships to earn income and (2) to quiet unhappy investors. Generally, the cost of acquisition of property with a useful life substantially beyond the taxable year is a cost that is capital in nature. Sec. 1.263(a)-2(a), Income Tax Regs. Petitioner expended $ 172,000 *397 for wind turbines. That type of property has a useful life substantially beyond the year of purchase. Sec. 168. Accordingly, the cost of that acquisition is not currently deductible, but rather should have been capitalized. Sec. 263(a). Petitioner next argues that the $ 1,088,002 is deductible as an ordinary and necessary business expense under section 162(a); Welch v. Helvering, 290 U.S. 111 (1933); Dunn & McCarthy, Inc. v. Commissioner, 139 F.2d 242 (2d Cir. 1943); Lohrke v. Commissioner, 48 T.C. 679 (1967); Woodward v. Commissioner, 397 U.S. 572 (1970).In light of our conclusion above, we address petitioner's arguments as they relate to the remaining $ 916,002. Respondent argues that the amounts expended by petitioner are not deductible under section 162(a); G C Services Corp. v. Commissioner, 73 T.C. 406 (1979); Deputy v. du Pont, 308 U.S. 488 (1940); Drachman v. Commissioner, 23 T.C. 558 (1954); H. & G. Industries, Inc. v. Commissioner, 60 T.C. 163 (1973), affd. 495 F.2d 653 (3d Cir. 1974); Morgan v. Commissioner, 46 T.C. 878 (1966); York Water Co. v. Commissioner, 36 T.C. 1111 (1961); Inland Asphalt Co. v. Commissioner, 756 F.2d 1425 (9th Cir. 1985).Specifically: Respondent *398 does not dispute the legal theories advanced by the petitioner, nor necessarily disagree with his interpretation of the authorities. However, for the reasons set forth below [various arguments of law and fact under section 162], respondent submits that these principles do not have any application in the context of this case, nor is there any plausible argument that they should yield the result sought by petitioner.
Respondent argues that the record does not support petitioner's factual assertions as to the purpose of the payments, and that, in any event, he is bound to the form of the assignments and must capitalize the amounts in dispute. Section 162(a) provides: (a) In General. -- There shall be allowed as a deduction all the ordinary and necessary expenses paid or incurred during the taxable year in carrying on any trade or business * * *
In order for amounts to be deductible under section 162(a), petitioner must prove that those amounts were actually expended. In the present case, the evidence does not establish that petitioner ever expended the moneys by payments to the investors. Petitioner argues that he paid $ 916,002 to disgruntled investors in order to preserve his client *399 relations and avoid lawsuits from those investors. Petitioner, however, testified that he would not have returned funds to investors if they did not agree to reinvest the moneys in the Wind Dynamics partnerships, as follows: Q You referred to checks that were written to "disgruntled investors" that are the subject of the deduction here in issue and you've stated that endorsement of those checks over to Wind Dynamics partnership was done by the investors. Was that a condition of payment? Would you have paid them the check if they had not agreed to endorse the check over to Wind Dynamics partnership? A No. Q Weren't you in control of all the Wind Dynamics partnerships? A I was in control of the funds at that time, yes.
All of the investors who purportedly received funds from petitioner reinvested those funds in the Wind Dynamics partnerships. One hundred and thirty-three of the 135 investors added their own funds to those received from petitioner. Petitioner represented himself to be the general partner of the Wind Dynamics partnerships, and he controlled all of the funds in those partnerships. Petitioner submitted at trial a schedule purporting to corroborate the amounts he claims *400 he provided to various investors, including the investors' contributions and the total investment in a given limited partnership. Petitioner described that document and its contents as follows: Q I'd have you refer to Exhibit 8-H. Mr. Donovan, can you describe what Exhibit 8-H is? A 8-H is a summary of all the Wind partnerships that were put together by Financial Dynamics compiled by the trustee of my estate. Q And if we were to turn, for example, to Wind Dynamics number 7, there's a column entitled fraudulent conveyances. What was that column intended to do? A Well, if I could use an example of the second person, Harry Bale, the investor funds column was an actual capital contribution by Harry Bale, and the $ 10,000 would have been a capital contribution by myself for a total contribution by Harry Bale of $ 20,000. Q Now, when you say contribution by yourself, did you contribute that money to Wind Dynamics, or in this case was it a check written to Mr. Bale himself? A I wrote a check to Mr. Bale. Q And he thereafter deposited it into Wind Dynamics 7? A He would have endorsed it over to a cashier's check which would have been deposited into Wind Dynamics 7. Q This column of fraudulent *401 conveyances shows $ 183,340 -- monies. Were those all monies advanced by you individually to various investors in Wind Dynamics 7? A Yes.
(The term "fraudulent conveyances" is apparently used in the testimony in the bankruptcy sense of avoidable transfers.) Petitioner also submitted copies of checks written from his Dynamic Equities account to the investors, copies of the individual investor's checks for their contribution to the new investment, and copies of the assignments to petitioner. All of those documents are riddled with inconsistencies. Twelve of the 35 investors in Wind Dynamics VII, Ltd., received checks from petitioner totaling $ 183,340; none of the copies of those checks submitted at trial included the backs of the checks. Only 24 of the 35 copies of checks written to investors in the Wind Dynamics XIV, Ltd., partnership submitted at trial included endorsements. All of the checks written to the investors in the Wind Dynamics XV partnership bore the notation "VOID" across the face of the checks. With respect to Wind Dynamics XVI, there is no evidence of endorsement on any of the checks to investors. There are instances of amounts appearing on petitioner's schedule as *402 paid to investors that do not match the amounts of the checks submitted into evidence, as follows: Partnership
Petitioner's Schedule
Actual Check
Wind Dynamics XIV
$ 12,000
$ 11,000
Wind Dynamics XV
10,000
9,900
Wind Dynamics XV
5,000
5,500
Wind Dynamics XVI
4,400
4,000
Wind Dynamics XVI
5,500
3,300 With respect to the purpose of the assignments executed with the investors, petitioner testified: "The wording on all of these was the same because my legal counsel told me that's the kind of wording that I should have to get something from them in writing to pin down why I was giving them any money." Some of the documents are handwritten, and some are missing investors' account numbers. It appears that the transfer of funds from accounts controlled by petitioner to the investors and the reinvestment of those funds into accounts controlled by petitioner were nothing more than a circular transfer of funds. Compare Allen v. Commissioner, 92 T.C. 1, 9 (1989), on appeal (9th Cir., June 13, 1989); Drobny v. Commissioner, 86 T.C. 1326, 1346 (1986); Karme v. Commissioner, 73 T.C. 1163, 1186 (1980), affd. 673 F.2d 1062 (9th Cir. 1982). No evidence reliably shows when and how petitioner paid what to whom. He *403 did not trace particular payments to particular complaints, and no payee testified at trial. Assuming, however, that he did make payments, the documents that he obtained and the immediate reinvestment of the payment in other ventures controlled by him undermine the assertion that the payees were disgruntled investors about to bring suit. Although he claims that the interests that he received under the assignments were worthless, his claims are not corroborated. He was given an opportunity after trial to present records from the bankruptcy court, but he did not do so. On consideration of the entire record, his generalized assertions cannot be accepted. He has not satisfied his burden of proving that he made the payments and that the payments were for deductible expenses. Before discussion of the additions to tax, our conclusion here must be reconciled with a comment made at the close of the trial. The Court indicated that this appeared to be a close case, because the testimony at trial was not inherently incredible, the assignments were explained by petitioner's testimony, and the existence of disgruntled investors seeking payoffs was a realistic scenario. Our comment specifically *404 noted that we had not had an opportunity to see all of the exhibits as of that time and that the pretrial memoranda had not adequately dealt with applicable case law. Moreover, we anticipated the necessity of dealing with the so-called "strong proof" rule. Upon examination of the exhibits, however, and discovery of the discrepancies set out above, we reach the conclusion that the testimony is not reliable, even if not demonstrably false. See Geiger v. Commissioner, 440 F.2d 688 (9th Cir. 1971), affg. a Memorandum Opinion of this Court. Additions to Tax
Negligence
Section 6653(a)(1), for the years in issue, provides for an addition to tax equal to 5 percent of the underpayment of tax if any part of the underpayment is due to negligence or intentional disregard of the rules or regulations. Section 6653(a)(2) provides for an additional 50 percent of the interest amount on the portion of the underpayment that is attributable to negligence. For the purposes of section 6653(a), negligence is the lack of due care or the failure to do what a reasonable and ordinarily prudent person would do under the circumstances. Neely v. Commissioner, 85 T.C. 934, 947 (1985).
Petitioner argues (1) *405 that he was not negligent in that he was the subject of a misunderstanding of the law and facts with respect to the deduction amounts; (2) that, due to his bankruptcy, it was difficult to access his books and records; and (3) that he could not be negligent if the issues presented were ones which this Court admitted were difficult and controversial. Petitioner did not claim the deductions on his returns for the years in issue; he claims the deductions as an offset to the now conceded unreported commission income. Petitioner received checks totaling $ 1,808,090 from Airtricity. He did not report those amounts as income or disclose them on his return. He has not proven that the failure to report this income is not due to negligence. Petitioner is liable for the additions to tax for negligence. Substantial Understatement
Section 6661, for the years in issue, provides an addition to tax equal to 25 percent of an underpayment of tax attributable to a substantial understatement of income tax. Petitioner argues that he acted in good faith and that there was substantial authority for the deductions of the payments from Airtricity. Petitioner has conceded, however, that he had unreported *406 income exceeding $ 1.8 million. He has cited no authority that justifies his failure to report that income. Petitioner did not disclose his present position on his return. We believe that this is the type of case where Congress intended doubts about taxability to be the subject of a disclosure on the return if the taxpayer is to avoid the addition to tax under section 6661. To reflect the foregoing and concessions by the parties, Decision will be entered under Rule 155. Footnotes
*. 50 percent of the interest due on the underpayment.↩