SIDNEY R. SMITH AND JUDY M. SMITH, Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Smith
Docket No. 17307-89
United States Tax Court
T.C. Memo 1992-353; 1992 Tax Ct. Memo LEXIS 372; 63 T.C.M. (CCH) 3164; June 22, 1992, Filed *372 Decision will be entered under Rule 155. L. Paige Marvel, for petitioners. Mary Gorman, for respondent. WRIGHT
WRIGHT
MEMORANDUM FINDINGS OF FACT AND OPINION WRIGHT, Judge: In her notice of deficiency, respondent determined the following income tax deficiency, additions to tax, and increased interest: Additions to Tax (plus increased interest)
Sec.
Sec.
Sec.
Sec.
Year
Deficiency
6653(b)(1)
6653(b)(2)
6621(c)
6661
1982
$ 23,357
$ 11,679
[1]
[2]
$ 5,839
After concessions, the issues for decision are: (1) Whether petitioners are liable under section 6653(b)[1] for an addition to tax due to fraud for claiming an investment tax credit and depreciation deduction in connection with a yacht-chartering activity during 1982. We hold that petitioners are liable. *373 (2) Whether petitioners are liable for an addition to tax under section 6661(a) due to a substantial understatement of income tax for taxable year 1982. We hold that petitioners are so liable. (3) Whether petitioners are liable for increased interest pursuant to section 6621(c) because the yacht-chartering transaction was tax motivated. We hold that we do not have jurisdiction over this matter. FINDINGS OF FACT Some of the facts have been stipulated by the parties. The stipulation of facts and attached exhibits are incorporated herein by this reference. Petitioners, Sidney R. and Judy M. Smith, resided in Pasadena, Maryland, at the time they filed the petition in this case. Petitioners timely filed their 1982 income tax return in April 1983. Petitioners reported income of $ 250 in connection with the "charter" of their yacht on December 31, 1982. They also claimed a depreciation deduction of $ 20,567, and an investment tax credit of $ 13,711 in connection with the "charter" activity. Petitioners went to settlement on the yacht (hereinafter the Rhiannon) on December 30, 1982. However, the Rhiannon had not yet been delivered from the manufacturer in Taiwan to its *374 port of final destination, the Port of Baltimore, until January 11, 1983. Therefore, no actual charter occurred in taxable year 1982. Respondent claims that petitioners fraudulently treated the Rhiannon as "placed in service" in 1982 in order to claim a depreciation deduction and an investment tax credit. Petitioners argue that they were unaware that the Rhiannon did not arrive at the Port of Baltimore until January 11, 1983, because they were told by their yacht broker that the Rhiannon had been delivered during the last week of 1982 and shown by him to a prospective buyer for which they received a $ 250 lease payment. Education and Employment History
Petitioner husband graduated from high school in June 1959. After high school, he attended both the Virginia Polytechnic Institute and the College of William and Mary, but never completed his college education. Petitioner husband never received a degree from an institution of higher learning. In 1971, he completed two accounting courses, Accounting I and Accounting II, at George Washington University. Petitioner husband was employed with the Internal Revenue Service (IRS) in Washington, D.C., from October *375 1969 to the date of the trial. From November 1969 through December 1970, he was a grade GS-7 revenue officer trainee in the Collection Division. From December 1970 to March 1972, he was employed as a GS-9 revenue officer with the Collection Division. In March 1972, petitioner husband was promoted to a GS-11 revenue officer position, and held that position until August 1973. In August 1973, he was promoted to a GS-12 program analyst position with the Director, Collection Division, Delinquent Account Branch. In August 1974, petitioner husband became a GS-13 program analyst for the Collection Division, Technical Branch. In December 1975, he was transferred to the Field Operations Branch where he served as a GS-13 program analyst. In March 1982, he became a GS-13 program analyst with the Office of Field Operations within the Office of Assistant Commissioner (Collections). In his employment with the IRS, petitioner husband received several memoranda of commendation, a special achievement award, and a merit pay cash award. At the date of the trial, he was employed as a GS-13 program analyst in the locator services and support section of the Office of Operations. Petitioner wife *376 graduated from John S. Mosby Academy in June 1961. From September 1961 to June 1962, she attended the Medical College of Virginia in Richmond, Virginia. From September 1962 to April 1963, she attended American University in Washington, D.C. Petitioner wife did not complete her college education and does not have a degree from any institution of higher learning. In 1972, she enrolled in and successfully completed the IRS basic tax law course, also known as the basic tax auditor course, for new auditors. Petitioner wife has completed various management, computer, speed reading, and writing courses offered by the IRS. Petitioner wife began employment with the IRS as a GS-3 clerk typist in November 1969. She was promoted to a GS-5 teller in the Collection Division in 1970. In 1972, she became a tax technician trainee in the Audit Division of the Office Audit Branch. Petitioner wife successfully completed her tax auditor training and was promoted to a GS-7 tax technician in 1973. She applied for, and was reassigned to, a position in the Office of the Assistant Commissioner, Taxpayers Service Division, Planning and Developing Branch of the IRS in the National Office as a management *377 assistant GS-7 in 1973. In 1974, she was promoted to a GS-9 program analyst. In 1975, petitioner wife was promoted to a GS-11 in the Field Program Branch of the Taxpayers Service Division of the IRS in the National Office. In 1976, she was promoted to a GS-12 program assistant in the same division. In 1977, she was again promoted to a GS-13 program analyst. In March 1980, petitioner wife was promoted to the position of staff assistant, GS-14, in the Office of the Director, Taxpayers Service Division of the IRS at the National Office. In 1983, she accepted a position as program analyst manager at the Bureau of Governmental Financial Operations within the Treasury Department. In 1985, she became a program manager of the Financial Management Service, Cash Management Division, Agency Programs Branch of the Treasury Department. During her employment with the IRS, petitioner wife received several certificates of appreciation, and two special achievement awards. In 1981, she received a special achievement award for her part in establishing a course on introduction to field operations, managing an intern program, and formulating the tax management careers program. In 1984, she received *378 a special achievement award for her work in developing the credit administration program, developing the vendor payment program, and drafting language on collections and deposits for Congress as part of the Debt Collection Act. Purchase of the "Rhiannon"
Although petitioners both worked for the IRS, they had an interest in operating their own business. Petitioners had a significant amount of experience in owning and operating boats of various kinds prior to 1982. Petitioner husband was experienced in the repair and maintenance of boats. Therefore, petitioners believed that a marine-related business would best utilize their experience and talents. Petitioners began to investigate operating a yacht-chartering business. In March 1982, petitioner husband traveled to Houston, Texas, to inspect and evaluate a Tanton 44 yacht that appeared to meet the requirements of the yacht needed for their yacht-chartering business. In May 1982, petitioners traveled to Houston again to further investigate the Tanton 44 yacht. On June 24, 1982, petitioners entered into a yacht purchase agreement with C. Michael English (English) and Clyde Eaton (Eaton), yacht brokers located in Annapolis, *379 Maryland. The yacht, the Rhiannon, was a C.T. 44 Tanton cutter, hull No. 7 sailboat to be built by Ta Chiao Brothers Yacht Building Co. (hereinafter Ta Chiao Brothers) in Taipei, Taiwan. On June 7, 1982, petitioners paid $ 500 by check to English as a downpayment for the Rhiannon. On June 24, 1982, petitioners paid $ 9,500 by check to English as a downpayment for the Rhiannon. During the summer of 1982, petitioner husband made "innumerable" trips from petitioners' residence in Columbia, Maryland, to Annapolis in order to meet with English and custom design the yacht interior and deck layout. Petitioner husband was quite familiar with the intricacies of the Tanton 44 yacht and suggested several changes to the Tanton 44 yacht that he had previously inspected in Houston. On July 27, 1982, Ta Chiao Brothers sent a mailgram to petitioners confirming that the Rhiannon was under construction. During August and September 1982, petitioners and Eaton exchanged correspondence in an attempt to insure that the yacht was constructed in accordance with petitioners' detailed specifications. On December 5, 1982, petitioners sold a boat named the Chimaera, which they had *380 owned since 1978, for $ 69,000. In 1978, petitioners borrowed $ 40,000 from the Internal Revenue Federal Credit Union (hereinafter the credit union) to purchase the Chimaera. At that time, petitioners entered a security agreement with the credit union which gave the credit union a security interest in the Chimaera. As part of the security agreement, petitioners agreed not to sell the Chimaera without the written consent of the credit union. Petitioners testified that they were unaware of the security interest and sold the Chimaera without the consent of the credit union. Petitioners continued to pay the monthly payments on the $ 40,000 loan from the credit union after they sold the Chimaera for $ 69,000. Petitioners planned to use some of the sales proceeds to purchase the Rhiannon. On December 11, 1982, petitioners made a partial payment on the Rhiannon by providing English of English & Eaton Yacht Brokers with a $ 10,000 certified check dated December 9, 1982. On December 18, 1982, petitioners completed an application for a loan from Yegen Marine to partially finance the purchase of the Rhiannon. Petitioner husband made a notation on the *381 Yegen Marine application which stated: "please expedite as settlement before end of year is desirable". Petitioner husband was aware of the potential tax benefits associated with placing the yacht in service prior to the end of 1982, including an investment tax credit and depreciation deduction. On December 30, 1982, petitioners settled on their contract to purchase the Rhiannon. At settlement, two checks were presented to English as payment for the Rhiannon. Petitioners gave English a $ 61,259 check dated December 30, 1982. A second check given to English in the amount of $ 25,000 represented money borrowed by petitioners from Yegen Marine and listed its payee as "Sidney R. Smith & Judy M. Smith and Michael English d/b/a A-CMECO". Both checks were not deposited until the latter part of January 1983. As of December 31, 1982, petitioners paid $ 106,259 for the purchase of the Rhiannon. The Charter Listing Agreement
On December 29, 1982, petitioner husband contacted Cecile Jurmain (Jurmain), the vice president of Seajay, Inc., a sailboat charter business. Petitioner husband informed Jurmain that petitioners would like Seajay, Inc., to handle the charter of *382 the Rhiannon. Petitioner husband told Jurmain that the Rhiannon had not been delivered as of December 29, 1982, but that it was on order from a yacht builder in Taiwan. On December 30, 1982, petitioner husband and Jurmain agreed on a chartering arrangement contingent on the Rhiannon's delivery and preparation for charter. In March 1983, Jurmain mailed a blank charter listing agreement to petitioners. Jurmain only filled in the blanks which listed the percentage commission Seajay, Inc., was to receive per charter. Petitioner husband filled in the date of the agreement as December 30, 1982. Petitioners signed the charter listing agreement but did not date it. Petitioner husband contacted Jurmain again in May 1983, to obtain references in order to determine whether Seajay, Inc., was a reputable business. At that time, petitioner husband informed Jurmain that he was performing most of the commissioning work for the Rhiannon and that he intended to have the yacht ready for charter by midsummer. Jurmain signed the charter listing agreement on August 16, 1983. Petitioners and Jurmain had hoped to have the yacht available for charter by Labor Day in 1983. However, *383 the Rhiannon needed further repairs and the first charter of the Rhiannon took place on September 22, 1983. The Blair Kershaw Transaction
Petitioners testified that on December 27, 1982, the first workday after Christmas, Eaton telephoned petitioner husband and advised him that their yacht had arrived at the Port of Baltimore. At some time in December, Eaton mentioned to petitioners that he had a friend that was interested in purchasing a yacht similar to the Rhiannon and would like the opportunity to inspect petitioners' yacht. Petitioners testified that they received a $ 250 check in December 1982, from Eaton's friend, Blair Kershaw (Kershaw). Kershaw purportedly paid $ 250 for the right to look at the Rhiannon while it was in dry storage at the Port of Baltimore, and before it had been commissioned. The customary practice in the yacht sales industry involves a broker or dealer's paying a fee to the yacht owner for the permission to show the owner's yacht to a potential purchaser. This practice is necessary because a yacht broker or dealer cannot afford to maintain a large number of high-priced yachts in its inventory. In this case, yacht brokers English *384 and Eaton did not pay petitioners for allowing Kershaw to inspect the boat. Kershaw made the $ 250 payment. As prospective purchasers, petitioners never paid a fee for the permission to look at a yacht that they considered purchasing. The $ 250 check from Kershaw failed to clear Kershaw's bank account and was returned marked NSF (Nonsufficient Funds). Petitioners received a second check from Kershaw, dated December 18, 1982, for $ 250. Petitioners never deposited the replacement check because there were insufficient funds in Kershaw's bank account to cover the $ 250 amount. Petitioners did not produce a charter agreement or any other documentation except for a bad check to substantiate the Kershaw transaction. The inspection of the Rhiannon by Kershaw did not take place in taxable year 1982 because the Rhiannon did not arrive at the Port of Baltimore until January 11, 1983. Delivery of the Yacht
The Rhiannon was shipped from Taiwan on December 12, 1982, aboard the Barber Tonsberg. The Barber Tonsberg arrived at the Port of Baltimore on January 11, 1983. An arrival notice and freight bill for the Rhiannon was sent to D. Lee Kraus Co. (Kraus *385 Co.), a foreign freight forwarder, indicating the arrival date to be January 11, 1983. The Kraus Co. paid the $ 2,784 import duty. The freight bill for the Rhiannon in the amount of $ 12,687 was paid on January 12, 1983, to Barber Steamship Lines, Inc.
Petitioner wife maintained a list of telephone calls and related charges during 1983 to support deductions for the yacht-chartering business. On January 11, 1983, the same day the Rhiannon arrived at the Port of Baltimore, a telephone call was made from petitioners' residence to the Kraus Co., the foreign freight forwarder. Petitioner wife entered the notation "canvas" on the list. Linda Kraus-Simpson (Kraus-Simpson), an employee of the Kraus Co., handled incoming telephone calls in 1983. Kraus-Simpson recalled receiving a telephone call from an individual requesting that the "canvas" remain with the boat. She remembered the telephone conversation because it was unusual for her to receive a call from someone other than a broker. Kraus-Simpson's normal practice when receiving telephone calls included determining whether the caller was a person to whom she should be disclosing information and informing the caller of the *386 arrival date for the vessel. Although the telephone call was made from their residence, both petitioners denied calling the Kraus Co. Petitioners did not attempt to explain the call to the Kraus Co. or the notation "canvas". On January 12, 1983, petitioners' yacht and mast were transported from the Port of Baltimore to Carback's Marina in Pasadena, Maryland, by Schiller Marine, a boat hauling business. Petitioners' list of telephone charges included a call to Schiller Marine on January 10 or January 11, 1983. Petitioners denied making a call on January 10 or 11 to Schiller Marine. Petitioners offered no explanation for the telephone call made from their residence to Schiller Marine. Petitioners first saw the Rhiannon in mid-January 1983, at Carback's Marina. Petitioners testified that they did not attempt to inspect the Rhiannon between December 27, 1982, and mid-January 1983, because they were busy during the holidays, and they were told that the Rhiannon was "jammed in solid" between off-loaded cargo. Between mid-January and March 15, 1983, the Rhiannon remained in dry storage at Carback's Marina. During this time petitioner husband and Eaton performed *387 the commissioning work on the Rhiannon. Commissioning a yacht involves a lengthy, detailed process including the inspection of the yacht's various systems, fittings, and equipment. It involves assembling yacht equipment and parts, and conditioning the yacht's exterior surface. The Rhiannon was first under sail in May 1983. The yacht's first charter occurred on September 22, 1983. Basis Determination on 1982 Federal Income Tax Return
Petitioner wife prepared petitioners' 1982 Federal income tax return. The 1982 tax return was signed and dated by petitioners on April 12, 1983. On the depreciation schedule (Form 4562) of the 1982 return, petitioners reported a basis in the yacht of $ 137,114. This generated a $ 20,567 depreciation deduction. On the investment tax credit form (Form 3468), petitioners reported the yacht's cost as $ 137,114, generating an investment tax credit of $ 13,711. In arriving at the $ 137,114 amount, petitioner wife utilized a figure from a general price list obtained from the office of English and Eaton. The general price list had a host of items that petitioners did not purchase in 1982. Petitioners calculated the Rhiannon's cost *388 as follows: Amount on General Price List
$ 133,240.00
Two trips to Houston
744.59
Consulting
114.00
Pictures sent to Taiwan
39.72
Boat show tickets
10.00
Phone calls
185.59
25 trips to Michael English's office
(56 miles X .20)
280.00
Lloyd's of London Certificate
2,500.00
Total Cost
$ 137,113.90
Petitioners' actual cost for the Rhiannon totaled $ 106,259. Petitioners prepared a detailed list of costs paid for the Rhiannon in 1982 entitled "Investment in Boat". The "Investment in Boat" schedule disclosed total costs of approximately $ 109,000 for 1982. Petitioner wife stated that when determining the basis for the Rhiannon she "just took an easy way out" by using as a starting point the $ 133,240 amount from the general price list. Petitioners sold the Rhiannon in 1986 for $ 108,000. In 1983, the State of Maryland required payment of a title tax equal to 5 percent of the gross purchase price of the yacht. On petitioners' application for the Maryland boat certificate, the gross purchase price was reported as $ 65,000. The title tax, 5 percent of $ 65,000, totaled $ 3,250 and was paid by petitioners in March 1983. Petitioner husband signed the *389 boat certificate application under penalty of perjury. Audit, Amended Return, and Notice of Deficiency
Petitioners timely filed their 1982 Federal income tax return in April 1983. Petitioners received an income tax refund of $ 19,941.90 for taxable year 1982. Revenue Agent Deborah Hall began an audit of petitioners' 1982 income tax return in January 1985. The parties executed Form 872, a Consent to Extend the Time to Assess Tax, on five different occasions resulting in an extension of time to assess petitioners' tax until April 15, 1989. By letter dated October 30, 1987, petitioners forwarded a $ 38,420.30 check payable to the IRS as a cash bond, pursuant to the provisions of Rev. Proc. 84-58, 1984-2 C.B. 501,to stop the running of the interest on the income tax and any accumulated interest for taxable year 1982. By letter dated December 28, 1987, in accordance with Rev. Proc. 84-58, supra, petitioners instructed the IRS to convert the $ 38,420.30 cash bond into a payment of the tax and interest for taxable year 1982. Rev. Proc. 84-58, section 4.03, 1984-2 C.B. 502-503, *390 provides that if the remittance equals or exceeds the proposed liability, no notice of deficiency will be mailed and the taxpayer will not have the right to petition the Tax Court for a redetermination of the deficiency. Enclosed with the December 28 letter was a timely filed Form 1040X Amended U.S. Individual Income Tax Return for 1982. On their amended return, petitioners conceded that they were not entitled to the Schedule C loss or investment tax credit claimed on their original income tax return for 1982 in connection with their yacht-chartering activity. On April 11, 1989, respondent issued a notice of deficiency to petitioners. The notice of deficiency included a $ 23,357 income tax deficiency even though petitioners had previously instructed the IRS, pursuant to Rev. Proc. 84-58, supra, to convert the $ 38,420.30 cash bond into a payment of the income tax and interest for taxable year 1982. Respondent mistakenly included the 1982 deficiency in income tax in the statutory notice since petitioners had, a year and 3 months prior to the issuance of the statutory notice, converted the $ 38,420.30 cash bond into a payment of their 1982 income *391 tax and interest in accordance with Rev. Proc. 84-58, supra. The notice of deficiency also determined additions to tax for fraud and a substantial understatement of income tax, and furthered determined increased interest under section 6621(c). The parties did not place petitioners' income tax liability for 1982 in dispute, but placed in issue all additions to tax and the section 6621(c) increased interest for 1982. OPINION Issue 1. Fraud
The existence of fraud is a question of fact to be determined from the entire record. Recklitis v. Commissioner, 91 T.C. 874, 909 (1988); Rowlee v. Commissioner, 80 T.C. 1111, 1123 (1983); Grosshandler v. Commissioner, 75 T.C. 1, 19 (1980). Respondent has the burden of proving fraud by clear and convincing evidence. Sec. 7454(a); Rule 142(b); Castillo v. Commissioner, 84 T.C. 405, 408 (1985); Stone v. Commissioner, 56 T.C. 213, 220 (1971). Respondent must establish: (1) That petitioners underpaid their taxes for the year in issue, and (2) that some part of the underpayment was due to fraud. Stone v. Commissioner, supra. *392 Fraud is established by proving that petitioners intended to evade tax, believed to be owing, by conduct intended to conceal, mislead, or otherwise prevent the collection of tax. Rowlee v. Commissioner, supra; Gajewski v. Commissioner, 67 T.C. 181 (1976), affd. without published opinion 578 F.2d 1383 (8th Cir. 1978). Fraud is never presumed; rather, it must be established by affirmative evidence. Beaver v. Commissioner, 55 T.C. 85, 92 (1970). Fraud may be proven by circumstantial evidence because direct proof of intent is rarely available. Spies v. United States, 317 U.S. 492, 499 (1943); Drobny v. Commissioner, 86 T.C. 1326, 1349 (1986); Rowlee v. Commissioner, supra.The taxpayer's entire course of conduct may establish the requisite fraudulent intent. Petzoldt v. Commissioner, 92 T.C. 661, 699 (1989); Stone v. Commissioner, supra at 223-224. Circumstantial evidence may include the implausibility of the taxpayer's explanations. Boyett v. Commissioner, 204 F.2d 205, 208 (5th Cir. 1953), *393 affg. a Memorandum of this Court dated Mar. 14, 1951. The sophistication of the taxpayer is also relevant to the determination of fraud. Halle v. Commissioner, 175 F.2d 500, 502 (2d Cir. 1949), affg. 7 T.C. 245 (1946); Kucera v. Commissioner, T.C. Memo. 1989-424. A fraudulent underpayment of taxes may result from an overstatement of deductions as well as an understatement of income. Drobny v. Commissioner, supra at 1349; Hicks Co. v. Commissioner, 56 T.C. 982, 1019 (1971), affd. 470 F.2d 87 (1st Cir. 1972); Neaderland v. Commissioner, 52 T.C. 532, 540 (1969), affd. 424 F.2d 639 (2d Cir. 1970). Having considered all the evidence before us, we conclude respondent has clearly and convincingly established fraud under section 6653(b) for taxable year 1982. Respondent contends that petitioners knew, at the time they filed their 1982 tax return, that the Rhiannon did not arrive at the Port of Baltimore until 1983, and nevertheless claimed a depreciation deduction and an investment tax credit for 1982. We agree and hold that petitioners *394 fraudulently treated the Rhiannon as placed in service in 1982 in order to reap the tax benefits from such a position. We find petitioners' testimony to be incredible. We are not required to accept the unpersuasive, self-serving testimony of petitioners. Tokarski v. Commissioner, 87 T.C. 74, 77 (1986). Petitioners consistently provided either no explanation or an implausible explanation to support their conduct. Both parties agree that the Rhiannon did not arrive at the Port of Baltimore until January 11, 1983. Petitioners testified that although they were told that the Rhiannon had arrived as of December 27, 1982, they made no attempt to inspect the yacht until mid-January 1983, because the Rhiannon was "jammed in" between some off-loaded cargo. However, petitioners also stated that they believed that Kershaw would be interested in looking at the yacht in the midst of these difficult surroundings, and pay them $ 250 to do so. Moreover, the fact that petitioners made 2 trips to Houston, Texas, and at least 25 trips to Annapolis, Maryland, due to their concern for every detail related to the construction of the Rhiannon, makes it incredible *395 that they would fail to travel the relatively short distance from Columbia, Maryland, to inspect the yacht for which they had just paid $ 106,259. Petitioner wife maintained a list of telephone calls and related charges in connection with their chartering activities. On January 11, 1983, the date the Rhiannon was delivered, petitioner wife recorded a call to Kraus Co., the foreign freight forwarder, with an accompanying notation "canvas". Kraus-Simpson, an employee of Kraus Co., remembered receiving a call from an individual requesting that the "canvas" remain with the yacht. Kraus-Simpson testified that her normal practice involved informing the caller as to the arrival date of the cargo carrying vessel. Petitioners deny that they called the Kraus Co. although the telephone call was made from their residence. On January 10 or 11, 1983, a telephone call was made from petitioners' residence to Schiller Marine. Schiller Marine was responsible for transporting the Rhiannon from the Port of Baltimore to Carback's Marina on January 12, 1983. Both petitioners deny calling Schiller Marine in connection with the transportation of their yacht. Petitioners offered no explanation *396 for the telephone calls made from their residence to the Kraus Co. or Schiller Marine. In the preparation of petitioners' 1982 income tax return, petitioner wife overstated the basis of the Rhiannon for depreciation and investment tax credit purposes by approximately $ 30,000. This overstatement is especially telling as petitioners had compiled a detailed list of costs associated with the purchase of the Rhiannon and chose not to use it in determining the proper basis of the Rhiannon for Federal tax purposes. We similarly find it highly suspect that petitioners would believe that Kershaw would be willing to pay $ 250 to "look" at the Rhiannon while it was "jammed in" between off-loaded cargo. The customary practice involved a payment by the yacht dealer to the owner for the right to show the yacht to a potential purchaser of a similar type of yacht. Petitioners themselves never paid a fee to "look" at a yacht that they were interested in purchasing. In addition, although petitioners had charter agreements substantiating other charters of the Rhiannon, they did not have any documentation to support the Kershaw "charter", except for a check from a bank account *397 with insufficient funds. We also note that petitioner husband told Jurmain, of Seajay, Inc., that the Rhiannon had not yet been delivered as of December 29, 1982, but that it was on order from a yacht builder in Taiwan. This conversation with Jurmain was subsequent to petitioner husband's purported conversation with Eaton on December 27, 1982, concerning the delivery of the Rhiannon. The Rhiannon was in dry storage from mid-January until March 15, 1983. The Rhiannon first set sail in May 1983. Jurmain sent petitioners a written charter agreement in March 1983, which petitioners completed and signed. Jurmain signed the charter agreement on August 16, 1983, and the Rhiannon was first chartered on September 22, 1983. Petitioners' course of conduct further supports the lack of credibility to be attributed to their testimony. In March 1983, petitioners understated the gross purchase price of the Rhiannon for Maryland title tax purposes. Petitioners reported the gross purchase price of the Rhiannon as $ 65,000, even though they actually paid $ 106,259 for the Rhiannon in 1982, and reported a cost basis of $ 137,114 on their 1982 income tax return. *398 Furthermore, when petitioners sold the Chimaera, they failed to obtain the consent of the credit union, which had a security interest in the Chimaera. Petitioners were aware of the potential depreciation deduction and investment tax credit that would be available if they could treat their yacht as being placed in service prior to the end of 1982. Petitioners were fairly sophisticated individuals who had experienced a significant amount of success in their careers with the IRS. They maintained a detailed set of records in support of their yacht-chartering activity and were extremely familiar with the intricacies relating to the design of their yacht. However, when testifying about the activity occurring between the last week in December 1982 and mid-January 1983, petitioners consistently and conveniently could not recall certain matters, or offered implausible explanations for other matters. Therefore, we hold that respondent has met her burden of proof and established that petitioners' underpayment of income tax was due to fraud. Thus, we sustain respondent's determinations for additions to tax under section 6653(b)(1) and (2). Issue 2. Section 6661 Addition to *399 Tax
Section 6661(a) imposes an addition to tax of 25 percent of the amount of any underpayment of income tax attributable to a substantial understatement. See Pallottini v. Commissioner, 90 T.C. 498 (1988). A substantial understatement occurs where the amount of the understatement exceeds the greater of 10 percent of the corrected tax liability or $ 5,000. Sec. 6661(b). Petitioners argue that respondent abused her discretion by failing to waive the section 6661 addition to tax. Section 6661(c) provides that the Commissioner may waive all or part of the section 6661 addition to tax upon a showing by the taxpayer that there was reasonable cause for the understatement and that the taxpayer acted in good faith. Circumstances that may indicate that a taxpayer had reasonable cause and acted in good faith include "an honest misunderstanding of fact or law that is reasonable in light of the experience, knowledge, and education of the taxpayer." Sec. 1.6661-6(b), Income Tax Regs. Whether respondent abused her discretion by failing to grant a waiver of the section 6661 addition to tax is subject to review by this Court. Mailman v. Commissioner, 91 T.C. 1079 (1988). *400 In the instant case, petitioners fraudulently claimed a $ 20,567 depreciation deduction, and a $ 13,711 investment tax credit in 1982. Therefore, petitioners failed to show reasonable cause for the position taken on their 1982 income tax return. Nor did petitioners act in good faith with respect to the positions taken on their 1982 return. Therefore, petitioners are liable for the addition to tax under section 6661(a) for 1982. Issue 3. Section 6621(c) Increased Rate of Interest
Section 6621(c)(1) provides that interest payable under section 6601 will be payable at an increased rate for any substantial underpayment of income tax attributable to a tax-motivated transaction. Section 6621(c), formerly section 6621(d), is effective for interest accruing after December 31, 1984. Section 7721(b) of the Omnibus Budget Reconciliation Act of 1989, Pub. L. 101-239, 103 Stat. 2106, 2399, repealed section 6621(c) effective for returns with a due date (determined without regard to extensions) after December 31, 1989. Petitioners contend that this Court lacks jurisdiction over increased interest because section 6621(c)(4) does not, in the instant case, allow this Court to determine *401 whether the increased interest applies. Section 6621(c)(4) provides as follows: (4) JURISDICTION OF TAX COURT -- In the case of any proceeding in the Tax Court for a redetermination of a deficiency, the Tax Court shall also have jurisdiction to determine the portion (if any) of such deficiency which is a substantial underpayment attributable to tax motivated transactions. [Emphasis added.] Section 6621(c)(4) only applies to a proceeding in the Tax Court for redetermination of a deficiency. Therefore, the Tax Court must have a proceeding for redetermination of a deficiency to have jurisdiction under section 6621(c)(4). In the instant case, petitioners filed a petition for only a redetermination of increased interest and additions to tax. Increased interest is not a "deficiency" within the meaning of section 6211(a). Odend'hal v. Commissioner, 95 T.C. 617, 621 (1990); White v. Commissioner, 95 T.C. 209, 212-215 (1990). Subchapter B of chapter 63 sets forth the deficiency procedures in the case of income, estate, gift, and certain excise taxes. Section 6213(a) of subchapter B authorizes the Tax Court to redetermine a deficiency *402 provided a timely petition is filed. (Hereinafter subchapter B of chapter 63 will be referred to as the deficiency procedures.) Section 6211(a) provides: For purposes of this title * * * the term "deficiency" means the amount by which the tax imposed * * * exceeds the excess of -- (1) the sum of (A) the amount shown as the tax by the taxpayer upon his return * * * plus (B) the amounts previously assessed (or collected without assessment) as a deficiency, over -- (2) the amount of rebates * * * made. Section 6601(e)(1) excludes interest from the definition of a "tax" imposed under section 6211(a). White v. Commissioner, supra at 213. Section 6601(e)(1) provides as follows: (1) INTEREST TREATED AS TAX. -- Interest prescribed under this section on any tax shall be paid upon notice and demand, and shall be assessed, collected, and paid in the same manner as taxes. Any reference in this title (except subchapter B of chapter 63, relating to deficiency procedures) to any tax imposed by this title shall be deemed also to refer to interest imposed by this section on such tax. [Emphasis added.] Interest prescribed by section 6601 is treated as *403 a tax "except [for purposes of] subchapter B of chapter 63, relating to deficiency procedures". Section 6211(a) is within subchapter B of chapter 63. The parenthetical language of section 6601(e)(1) expressly excludes interest from the definition of a "tax" for purposes of section 6211(a) and, therefore, interest is not a deficiency. Section 6601(e)(1) only applies to interest prescribed under section 6601. Section 6621(c)(1) increases the rate of interest payable under section 6601 to 120 percent of the underpayment rate for substantial underpayments attributable to tax-motivated transactions. Increased interest is the "interest" prescribed under section 6601, with the rate increased to 120 percent of the underpayment rate. Therefore, increased interest is not a "deficiency" within the meaning of section 6211(a), and a proceeding for redetermination of increased interest is not a proceeding for redetermination of a deficiency within the meaning of section 6621(c)(4). White v. Commissioner, supra at 215. However, in their petition for redetermination, petitioners also contested the additions to tax set forth in respondent's notice of deficiency. Section *404 6662(a)(2) provides that "Any reference in this title to 'tax' imposed by this title shall be deemed also to refer to the additions to the tax, additional amounts, and penalties provided by this chapter." (Section 7721(a) of the Omnibus Budget Reconciliation Act of 1989, Pub. L. 101-239, 103 Stat. 2106, 2395, deleted the provisions contained in section 6662 and added identical provisions to section 6665.) Respondent determined that petitioners are liable for additions to tax under sections 6653(b)(1), 6653(b)(2), and 6661. Additions to tax under sections 6653(b)(1), 6653(b)(2), and 6661 are taxes for purposes of the deficiency procedures under 6662(a). Under section 6662(a) some additions to tax are treated as taxes and thus are deficiencies under section 6211(a). Therefore, in the instant case, a proceeding for redetermination of the additions to tax is a proceeding for redetermination of a deficiency within the meaning of section 6621(c)(4). However, this does not complete our inquiry. The deficiency referred to in the preceding paragraph is not a deficiency involving a substantial underpayment attributable to a tax-motivated transaction. See White v. Commissioner, supra at 216. *405 Section 6621(c)(4) provides that the Tax Court shall have jurisdiction to determine "the portion (if any) of such deficiency which is a substantial underpayment attributable to tax motivated transactions". (Emphasis added.) The language "such deficiency" refers to the deficiency which the Court is redetermining. The Tax Court only has jurisdiction to determine the portion of the deficiency before the Court which is "a substantial underpayment attributable to tax motivated transactions". Section 6621(c)(2) provides in part: the term "substantial underpayment attributable to tax motivated transactions" means any underpayment of taxes imposed by subtitle A * * * [Emphasis added.] A substantial underpayment attributable to tax-motivated transactions only includes taxes imposed by subtitle A. The only deficiencies in the instant case are additions to tax under sections 6653(b) and 6661. Additions to tax are imposed by subtitle F, not subtitle A. Thus, no portion of the deficiency before the Court is attributable to taxes imposed by subtitle A. That is, the instant case is not a proceeding for redetermination of a deficiency in income tax because the income tax for 1982 *406 was paid in accordance with Rev. Proc. 84-58, 1984-2 C.B. 501, prior to the issuance of respondent's statutory notice. Pursuant to Rev. Proc. 84-58, section 4.03, 1984-2 C.B. 502-503, petitioners no longer had the right to petition the Tax Court for the redetermination of the income tax deficiency because they had converted their $ 38,420.30 cash bond into a payment of their income tax liability for 1982 prior to the issuance of respondent's statutory notice. [2] Therefore, no portion of the deficiency before the Court is attributable to taxes imposed by subtitle A. Accordingly, no portion of the deficiency before the Court can be a substantial underpayment attributable to a tax-motivated transaction. *407 The instant case is factually similar to Odend'hal v. Commissioner, 95 T.C. 617 (1990). In Odend'hal, the taxpayer paid the income tax and regular interest for the years in issue prior to the Commissioner's issuance of the statutory notice. The Commissioner issued a statutory notice determining additions to tax under section 6651(a)(1) and increased interest under section 6621(c). This Court applied the reasoning of White v. Commissioner, 95 T.C. 209 (1990), and held that under section 6621(c)(4), this Court did not have jurisdiction to determine increased interest because the deficiency before the Court was not a substantial underpayment attributable to a tax-motivated transaction. The sole difference between the facts in Odend'hal and those of the instant case is that in the case at hand, respondent mistakenly included an income tax deficiency for 1982 in her statutory notice. That is, 1 year and 3 months before the statutory notice was issued, petitioners converted their cash bond into payment made in satisfaction of their 1982 income tax liability pursuant to the instructions set forth in Rev. Proc. 84-58, *408 supra. At that time, according to the procedures established by respondent in Rev. Proc. 84-58, supra, no notice of deficiency as to income tax should have been issued and petitioners no longer had the right to petition the Tax Court for a redetermination of the income tax deficiency. Respondent's administrative oversight of including in her statutory notice an income tax deficiency which had previously been paid pursuant to instructions set forth in Rev. Proc. 84-58, supra, is an insufficient basis for distinguishing the instant case from Odend'hal. Accordingly, in the instant case, we hold that this Court does not have jurisdiction under section 6621(c)(4) to determine whether the increased interest of section 6621(c) applies because the deficiency before the Court is not a substantial underpayment attributable to a tax-motivated transaction. See Powell v. Commissioner, 96 T.C. 707 (1991); Odend'hal v. Commissioner, supra.
To reflect the foregoing, Decision will be entered under Rule 155. Footnotes
1. 50 percent of the interest due on the portion of the underpayment attributable to fraud. ↩
2. Increased interest rate for substantial underpayment of tax attributable to tax-motivated transactions.↩
1. All section references are to the Internal Revenue Code in effect for the year in issue. All Rule references are to the Tax Court Rules of Practice and Procedure.↩
2. Rev. Proc. 84-58, 1984-2 C.B. 501↩, makes it clear that a remittance made after the mailing of the notice of deficiency in complete or partial satisfaction of the deficiency will not deprive the Tax Court of jurisdiction over the deficiency.