T.C. Summary Opinion 2001-112

UNITED STATES TAX COURT

JAMES R. AND JANET M. LANDRUM, Petitioners <u>v</u>.
COMMISSIONER OF INTERNAL REVENUE, Respondent

Docket No. 919-00S.                    Filed July 26, 2001.

<u>O. Christopher Meyers</u>, for petitioners.

<u>Ann L. Darnold</u>, for respondent.

WOLFE, <u>Special Trial Judge</u>:  This case was heard pursuant to the provisions of section 7463 of the Internal Revenue Code in effect at the time the petition was filed.  The decision to be entered is not reviewable by any other court, and this opinion should not be cited as authority.  Unless otherwise indicated, subsequent section references are to the Internal Revenue Code in effect for the years in issue.

Respondent determined deficiencies in petitioners' 1996 and 1997 Federal income taxes of $4,805 and $6,720, respectively, and an accuracy-related penalty under section 6662(a) for 1997 of $1,344. The issues for decision are: (1) Whether petitioners' Amway distributorship was an activity engaged in for profit within the meaning of section 183; (2) whether petitioners are entitled to claimed Schedule C deductions for expenditures relating to their Amway activity; (3) whether petitioners are entitled to deduct as charitable contributions amounts in excess of the amounts allowed by respondent; and (4) whether petitioners are liable for an accuracy-related penalty under section 6662(a) for 1997.

Background

Some of the facts have been stipulated and are so found. The stipulation of facts and the attached exhibits are incorporated herein by this reference.

When the petition was filed, petitioners resided in Lawton, Oklahoma. Petitioner James R. Landrum (Mr. Landrum) worked full-time for Goodyear Tire and Rubber Co. (Goodyear) as a quality technician in 1996 and as an alignment specialist in 1997. Petitioner Janet M. Landrum (Mrs. Landrum) worked full-time as an x-ray technician for Southwestern Medical Center during both years in issue. Petitioners' four children were, respectively,

14, 16, 21, and 24 years of age at the time of trial (January 22, 2001).

For convenience and clarity, additional findings of fact and the applicable law are discussed together with respect to each issue.

Background Concerning Amway

Prior to the years in issue, petitioners had three separate experiences with Amway, beginning in 1974. Mr. Landrum was a corporal in the Marine Corps and was stationed in Hawaii in 1974. His Amway activity consisted of purchasing cases of wax from an Amway distributor at wholesale, selling "a case or two a month to [his] friends," and keeping the difference between the wholesale and retail prices. He ceased his activities with Amway in 1976 when he was transferred from Hawaii and then released from active duty with the Marine Corps. After their marriage in 1977, petitioners participated in an Amway distributorship. Their experience with Amway was unprofitable, and they terminated it after 2 years. Petitioners became involved with Amway a third time in 1985, while Mr. Landrum was employed at Goodyear. Although petitioners had about 50 persons reporting to them, directly or indirectly, in the pyramid structure of Amway, there were insufficient sales for profit. Petitioners' third Amway venture lasted approximately 2 years, and again, petitioners

terminated the activity for lack of profit.  In late 1995, petitioners were introduced to Amway a fourth time by friends of Mrs. Landrum.  This fourth Amway experience is the subject of the present controversy.

Petitioners understood the Amway structure and compensation technique throughout the years in issue.  Mr. Landrum summarized it in terms of a 6-4-2 illustration.  He explained that the Amway participant should purchase his own household products from Amway.  If he buys $100 of merchandise monthly, he receives a bonus.  He then recruits six other persons to use $100 of Amway merchandise monthly, and consequently the initial Amway participant receives appropriate bonus amounts with respect to those six persons.  He is "upline" from them, and they are "downline" from him.  If each of the six downline recruits then enlists four subrecruits, each of whom uses $100 of products monthly, the initial Amway participant receives bonus as to usage from this larger group (1 + 6 + 24 for a total of 31).  Finally, in this illustration, if each of the 24 subrecruits persuades two additional people to participate in Amway and purchase $100 of product monthly, the group relevant to the computation of the initial Amway participant's monthly bonus will be expanded to an even larger number (1 + 6 + 24 + 48 for a total of 79).  In the 6-4-2 illustration, if each participant continues to purchase

$100 of merchandise monthly, the initiator of the group will receive commission based on monthly sales of $7,900, subject to commission-sharing adjustments. Mr. Landrum estimated that the person who established a successful 6-4-2 grouping would receive $1,800 to $2,200 in monthly commissions and then might proceed to gain even greater benefits as a "direct distributor" who might then triple his organization and receive an "Emerald bonus" and then expand to have six legs and a "Diamond organization". According to Mr. Landrum, Amway distributors with an emerald organization make $75,000 to $100,000 annually, and those with a diamond organization make $125,000 to $250,000 yearly, "And it goes up from there" as he put it.[1]

Petitioners had no such experience during the years in issue and all the earlier years of their participation in Amway distributorships. There simply is no resemblance between the wonderfully optimistic projection that Mr. Landrum recited and the reality of petitioners' experience during their many years of association with Amway.

---

[1] See Nissley v. Commissioner, T.C. Memo. 2000-178, for this Court's recent summary of Amway operations with somewhat more detail and less fantasy, at least as to himself, than Mr. Landrum provided.

1. <u>Petitioners' Amway Distributorship Was Not an Activity</u>
   <u>Engaged in for Profit During 1996 and 1997</u>

Petitioners filed Schedules C, Profit and Loss From
Business, with their 1996 and 1997 Federal income tax returns and
reported the following:

| Income | 1996 | 1997 |
|---|---|---|
| Gross receipts | $150 | $84.63 |
| Less:  cost of goods sold | -0- | -0- |
| Gross income | 150 | 84.63 |
| Expenses | | |
| Car and truck | $8,866 | $12,119 |
| Commission and fees | 28 | -0- |
| Legal and professional services | 300 | 300 |
| Travel | 45 | 380 |
| Meals and entertainment | 305 | 437 |
| Other expenses[1] | 2,358 | 2,545.39 |
| Total expenses | 11,902 | 15,781.39 |
| Total net losses | (11,752) | (15,696.76) |

[1]The "Other expenses" claimed for 1996 were:

| | |
|---|---|
| Monthly seminars (11 seminars at $28 each) | $308 |
| Quarterly conferences (3 conferences at $130 each, plus food and lodging) | 840 |
| Tapes, catalogs, business support | 850 |
| Cell phone (basic) | 360 |

The "Other expenses" claimed for 1997 were:

| | |
|---|---|
| Monthly training seminars (tickets) | $308 |
| Quarterly conferences (3) | 470 |
| Training tapes and business support | 1,767.39 |

In the notices of deficiency for 1996 and 1997, respondent
determined that petitioners' Amway activity did not satisfy
requirements for carrying on a business, and that the expenses

incurred in connection with the Amway activity were therefore deductible only to the extent of income earned from the activity.

Section 183(a) provides that if an activity engaged in by an individual is not engaged in for profit, no deduction attributable to such activity shall be allowed, except as provided in section 183(b).[2] An "activity not engaged in for profit" means any activity other than one for which deductions are allowable under section 162 or under paragraph (1) or (2) of section 212. Sec. 183(c). Section 162 allows a deduction for all the ordinary and necessary expenses paid or incurred during the taxable year in carrying on a business. Section 212 allows a deduction for all the ordinary and necessary expenses paid or incurred during the taxable year for the production or collection of income, or for the management, conservation, or maintenance of property held for the production of income. The profit standards applicable to section 212 are the same as those used in section 162. Antonides v. Commissioner, 893 F.2d 656, 659 (4th Cir. 1990), affg. 91 T.C. 686 (1988).

---

[2]     In the case of an activity not engaged in for profit, sec. 183(b)(1) allows a deduction for expenses that are otherwise deductible without regard to whether the activity is engaged in for profit. Sec. 183(b)(2) allows a deduction for expenses that would be deductible only if the activity were engaged in for profit, but only to the extent that the total gross income derived from the activity exceeds the deductions allowed by sec. 183(b)(1).

For a taxpayer to deduct expenses of an activity under section 162, he must show that he engaged in the activity with an actual and honest objective of making a profit. Ronnen v. Commissioner, 90 T.C. 74, 91 (1988); Fuchs v. Commissioner, 83 T.C. 79, 98 (1984); Dreicer v. Commissioner, 78 T.C. 642, 645 (1982), affd. without opinion 702 F.2d 1205 (D.C. Cir. 1983); sec. 1.183-2(a), Income Tax Regs. Although a reasonable expectation of profit is not required, the taxpayer's profit objective must be bona fide. Hulter v. Commissioner, 91 T.C. 371, 393 (1988); Beck v. Commissioner, 85 T.C. 557, 569 (1985). "Profit" in this context means economic profit, independent of tax savings. Drobny v. Commissioner, 86 T.C. 1326, 1341 (1986). Whether a taxpayer has an actual and honest profit objective is a question of fact to be resolved from all the relevant facts and circumstances. Keanini v. Commissioner, 94 T.C. 41, 46 (1990); sec. 1.183-2(b), Income Tax Regs. Greater weight is given to objective facts than to a taxpayer's statement of intent. Thomas v. Commissioner, 84 T.C. 1244, 1269 (1985), affd. 792 F.2d 1256 (4th Cir. 1986); sec. 1.183-2(a), Income Tax Regs.

Section 1.183-2(b), Income Tax Regs., provides the following nonexclusive list of factors to consider in determining whether an activity is engaged in for profit: (1) The manner in which the taxpayer carried on the activity; (2) the expertise of the

taxpayer or his advisers; (3) the time and effort expended by the taxpayer in carrying on the activity; (4) the expectation that the assets used in the activity may appreciate in value; (5) the success of the taxpayer in carrying on other similar or dissimilar activities; (6) the taxpayer's history of income or losses with respect to the activity; (7) the amount of occasional profits, if any, which are earned; (8) the financial status of the taxpayer; and (9) elements of personal pleasure or recreation.

These factors are not merely a counting device where the number of factors for or against the taxpayer is determinative. Instead, all facts and circumstances must be taken into account, and more weight may be given to some factors than to others. Dunn v. Commissioner, 70 T.C. 715, 720 (1978), affd. 615 F.2d 578 (2d Cir. 1980). Some of the factors summarized above are inapplicable to this situation, and others provide little guidance to the resolution of the question here. Therefore, we focus on the factors that lead to our decision.

The most significant factors by far in this case are petitioners' long history of failure in Amway activities and their almost total lack of gross revenue from those activities during the period in issue. Three times before the years in issue Mr. Landrum had attempted Amway activity, and Mrs. Landrum

had participated in the last two of those efforts. Each time the activity was terminated after 2 years. Mr. Landrum says he stopped the activity the first time because he was in the military and left the area of his Amway activity. He mentions that the birth of petitioners' first child had something to do with terminating Amway the second time. Nevertheless, petitioners' own testimony establishes that they never made any significant amount from three previous Amway efforts. They tried different approaches. In the first effort, Mr. Landrum sold some product but did not enlist "downline" distributors. The second effort, in 1977-1979 was, according to Mr. Landrum, "just kind of a break-even deal." During the third effort, in 1985-1987, petitioners built up their downline distributorship to include more than 50 people, but as Mr. Landrum explained, "they weren't doing a lot of product", and consequently, once again there was no profit.

The obvious question is why after three strikes petitioners did not call themselves out of Amway permanently. They have provided no satisfactory answer. Instead, they explain that in 1995 they were introduced to Amway again. Mrs. Landrum testified that they were "personal friends" with people that were doing Amway successfully, so they thought they also could succeed. These "personal friends" were upline seven or eight steps from

petitioners (at the so-called emerald level) and sometimes would work with them. Mr. Landrum explained that his friend and upline adviser told him he would have to spend $500 per month on inspirational and instructive tapes and materials, for approximately 3 months, and then he could expect to gross $500 to $1,000 or more monthly from Amway. From this advice, what they read in Amway literature, and what they heard at Amway seminars, petitioners say that when they started a fourth time in 1995 they expected to start making a profit in 90 days. Despite mounting losses, petitioners continued their Amway activity for more than 2 years beyond the 90-day trial period, long after it was clear that the activity was not viable. The regulations provide that "where losses continue to be sustained beyond the period which customarily is necessary to bring the operation to profitable status such continued losses, if not explainable, as due to customary business risks or reverses, may be indicative that the activity is not being engaged in for profit". Sec. 1.183-2(b)(6), Income Tax Regs.

The exact date when petitioners commenced their fourth effort at Amway is unclear, but petitioners' own testimony establishes that it was in 1995. Since petitioners might have explained the starting date and failed to do so, we conclude that the entire 90-day starting period that petitioners mention took

place prior to the years in issue. By the beginning of 1996, petitioners had ample experience with Amway and even had tried it for the appropriate initiating time with their new group and the aid of their "personal friends". Their decision to continue their Amway activity during 1996 and 1997 after their extensive and wholly unsuccessful experiences with Amway simply cannot be accepted as a bona fide business decision.

Petitioners did not conduct their Amway activity in a businesslike manner during the years in issue. They had no separate bank account for Amway. They had no records concerning their meager receipts. Mr. Landrum suggested that the few dollars of receipts must have been from the little checks that Amway occasionally sent, but he had no records about such matters. Petitioners kept receipts of expenditures and calendars, but these materials were not organized or analyzed in any manner to improve results. Petitioners did not retain canceled checks or banking records to prove their expenditures. Petitioners had no business plan other than the 6-4-2 concept and a one-page inspirational listing of such items as "Listen to at least one audiotape promoted by our upline" and "Read 15 minutes per day from a book promoted by our upline". They did not consult with business experts but relied only on advice from one of their upline distributors and other interested Amway persons.

Under the Amway system, the upline distributor's income depends on the downline person's sales, so the upline person's interest is to keep as many people as possible in his organization without regard to profitability. Nissley v. Commissioner, T.C. Memo. 2000-178.

The amount of profits in relation to the amount of losses incurred, and in relation to the amount of the taxpayer's investment and the value of the assets used in the activity, also are relevant in determining the taxpayer's intent. Sec. 1.183-2(b)(7), Income Tax Regs. Petitioners' gross receipts of $150 and $84.63 in 1996 and 1997, respectively, were trivial in relation to their total claimed expenses of $11,902 and $15,781.39, respectively. The magnitude of these discrepancies is an indication that petitioners did not have the requisite profit objective. See, e.g., Burger v. Commissioner, T.C. Memo. 1985-523, affd. 809 F.2d 355 (7th Cir. 1987).

We do not question that petitioners spent some time and money in their Amway activity. But petitioners' evidence as to the extent of these efforts and expenditures is questionable and exaggerated. The claims to mileage exceed the distances to some of their claimed destinations. Petitioners presented numerous receipts for expenditures for Amway tools, but there are no checks to substantiate the payments. The upline sponsors,

supposedly petitioners' personal friends, and others in the Amway chain, did not testify to confirm petitioners' efforts and expenditures.

Substantial income from sources other than the activity may indicate that the activity is not engaged in for profit, particularly if the losses from the activity generate substantial tax benefits. Sec. 1.183-2(b)(8), Income Tax Regs. Petitioners were not wealthy people. They explain their needs for funds for retirement and other purposes. However, in the years in issue, Mr. and Mrs. Landrum maintained full-time jobs apart from their Amway activity. They reported combined wages for 1996 and 1997 of $83,797.08 and $86,401.55, respectively. This income was more than sufficient to allow their Amway losses to generate substantial tax benefits.

Mr. Landrum said he enjoyed meeting "good people" in his Amway sales efforts, although he did not enjoy the rejection of his proposals. Petitioners qualified to attend Amway promotional weekend meetings by accumulating the required points within a limited time. They qualified by buying a vacuum cleaner and making other Amway purchases themselves, not by selling to others or enlisting downline distributors. Nevertheless, petitioners attended numerous inspirational weekend programs, both together and separately. Mr. Landrum explained the excitement and

enthusiasm of these weekends but was not willing explicitly to classify them as pleasure.  Sometimes petitioners went separately, partly because of his work schedule and partly because they were separated during some portion of the years in issue.  Petitioners' expenditure of substantial funds and attendance at numerous Amway conventions and seminars, near and far, even though their financial return from Amway was nil, and had been minimal during many years of Amway experience, suggests an element of pleasure or recreation in the participation.  See Nissley v. Commissioner, supra, where we commented about this aspect of the Amway organization as follows: "The record suggests that petitioners enjoy the same congenial sense of family and the same gratifying motivational feeling from participating in their Amway activity as do many other individuals who remain committed to Amway."

Based upon the objective facts and the totality of the circumstances, petitioners' contention that their Amway activity was engaged in for profit is unsupportable.  They had extensive experience with Amway.  By the years in issue they knew or surely should have known that they were not going to make money at Amway.  They benefited to some extent by deducting automobile and legal and other necessary expenditures that otherwise would be nondeductible, and they participated in the excitement of the

Amway conventions and inspirational weekends. But certainly on this record we must conclude that they did not have an actual and honest profit objective in their Amway activities in 1996 and 1997. Because we hold that petitioners' Amway activity was not an activity engaged in for profit within the meaning of section 183, we do not explicitly address the alternative issue as to whether petitioners are entitled to claimed Schedule C deductions for expenditures relating to their Amway activity. We note, however, that, as pointed out above, we consider petitioners' claims to such deductions exaggerated and erroneous, and we consider their testimony as well as the documents they presented in substantiation to be inaccurate and distorted in their favor.

The examination in this case commenced after July 22, 1998. Accordingly, section 7491(a), a new provision created by Internal Revenue Service Restructuring and Reform Act of 1998 (RRA 1998), Pub. L. 105-206, sec. 3001, 112 Stat. 726, concerning the allocation of the burden of proof, is effective. Higbee v. Commissioner, 116 T.C. ___ (2001). In the present case, we do not rest our decision on the burden of proof. As demonstrated above, the totality of evidence here, including the stipulation of facts, petitioners' own testimony, and petitioners' own records, amplified by their explanatory testimony, establish overwhelmingly that petitioners did not conduct their Amway

activity with a bona fide profit objective during 1996 and 1997.
Plainly, if respondent had the burden of proof, he satisfied it;
so section 7491(a) is of no help to petitioners.  Kelly v.
Commissioner, T.C. Memo. 2001-161.  Also, since petitioners
failed to introduce credible evidence of their profit objective
and failed to cooperate with respondent's reasonable requests for
witnesses, information, documents, meetings, and interviews
through failure of their accountants or otherwise, section
7491(a) would not place the burden of proof as to this issue on
respondent.  Higbee v. Commissioner, supra.

2.  Charitable Contributions

Petitioners filed Schedules A, Itemized Deductions, with
their joint Federal income tax returns in 1996 and 1997, and
reported the following gifts to charity:

|                                    | 1996    | 1997    |
|------------------------------------|---------|---------|
| Gifts by cash or check             | $2,200  | $2,600  |
| Gifts other than by cash or check  | 5,200   | 6,700   |
| Total gifts                        | 7,400   | 9,300   |

Respondent determined that petitioners did not adequately
substantiate the fair market value of the clothing and other
items that they contributed to various nonprofit organizations.
Accordingly, respondent allowed deductions for charitable
contributions for 1996 and 1997 in the amounts of $740 and $930,
respectively.  The amounts allowed represent 10 percent of the

amounts claimed as contributions on petitioners' 1996 and 1997 Federal income tax returns.

Deductions for charitable contributions are allowable only if verified under regulations prescribed by the Secretary. Sec. 170(a). Section 1.170A-13, Income Tax Regs., in turn, sets forth the types of substantiation necessary to support deductions for charitable contributions.

For charitable contributions of money, taxpayers must maintain for each contribution one of the following: (1) A canceled check; (2) a receipt from the donee organization; or (3) other reliable written records. Sec. 1.170A-13(a)(1), Income Tax Regs. Petitioners testified that they regularly made cash and check contributions averaging $50 per week to First Assembly of God in Lawton, Oklahoma. Petitioners, however, could produce no evidence in support of this claim. Petitioners testified that they lost the receipts, and that the church did not have any records dating back to either 1996 or 1997. Petitioners had no canceled checks to substantiate any portion of their alleged contributions.

We are not required to accept a taxpayer's uncorroborated testimony at face value if it is improbable, unreasonable, or questionable. Lovell & Hart, Inc. v. Commissioner, 456 F.2d 145, 148 (6th Cir. 1972), affg. T.C. Memo. 1970-335; Tokarski v. Commissioner, 87 T.C. 74, 77 (1986). In view of their testimony

concerning their need for funds for retirement savings and other purposes, and their complete failure of substantiation by check or receipt or corroborating testimony, we decline to believe petitioners' self-serving testimony as to their cash contributions. We hold that petitioners are not entitled to deductions for cash contributions beyond the amounts allowed by respondent.

For charitable contributions of property other than money, taxpayers generally must maintain for each contribution a receipt from the donee showing the following information: (1) The name of the donee; (2) the date and location of the contribution; and (3) a description of the property in detail reasonably sufficient under the circumstances. Sec. 1.170A-13(b)(1), Income Tax Regs. The amount of the contribution is the fair market value of the property at the time of the contribution. Sec. 1.170A-1(c)(1), Income Tax Regs.

Petitioners' contributions of property other than money consisted of used clothing and household appliances. To substantiate their values, petitioners offered documents consisting of preprinted forms issued by charitable organizations that petitioners filled in with the type and number of items allegedly donated and the estimated value of the donation. Petitioners testified that they determined the values by

comparing prices in classified ads, used furniture stores, and the retail sales outlets of various charitable organizations.

While the preprinted forms appear authentic, we nevertheless conclude that petitioners' self-generated receipts and other documents do not substantiate the deductions claimed in the instant case.  See Higbee v. Commissioner, supra.  We do not find petitioners' valuations reliable.  The value of an individual's used clothing and old furniture and furnishings, in questionable condition, obviously is not the same as the retail asking price or list price at a retail store, even a second-hand store.  Once again we note that petitioners testified about their need for funds.  Consequently, if they really had items worth many thousands of dollars, they might be expected to sell these items and use the proceeds to satisfy their admitted financial needs.  They did not do so, but chose to give away the property in question without obtaining any sort of appraisal and claim substantial deductions.  Under these circumstances, we must conclude that petitioners have exaggerated the value of their charitable contributions.  We hold that petitioners have failed to introduce credible evidence to substantiate the actual items contributed and their fair market values.  Accordingly, petitioners' deductions for charitable contributions are limited to the amounts allowed by respondent.

3. Accuracy-Related Penalty

Section 6662(a) imposes an accuracy-related penalty of 20 percent of the portion of the underpayment which is attributable to negligence or disregard of rules or regulations. Sec. 6662(b)(1). Negligence is the lack of due care or failure to do what a reasonable and ordinarily prudent person would do under the circumstances. Neely v. Commissioner, 85 T.C. 934, 947 (1985). The term "disregard" includes any careless, reckless, or intentional disregard. Sec. 6662(c). No penalty shall be imposed if it is shown that there was reasonable cause for the underpayment and the taxpayer acted in good faith with respect to the underpayment. Sec. 6664(c).

As to the penalty under section 6662(a), under RRA 1998, respondent has the burden of production, sec. 7491(c), but not the burden of proof. The requirements of RRA 1998 as to penalty provisions are discussed in detail in Higbee v. Commissioner, 116 T.C. ___ (2001), and there is no reason to repeat that discussion here.

Respondent has shown that petitioners have failed to keep adequate books and records and that such records as they have kept are inaccurate or exaggerated. Respondent also has demonstrated that petitioners' claim that they were engaged in the Amway activity in 1996-1997 with a bona fide profit objective is erroneous and inappropriate in view of petitioners' long and

unsuccessful experience with Amway. Additionally, respondent has shown that petitioners failed to substantiate their claimed charitable contribution deductions. These circumstances show that respondent has met his burden of production for his determination of the accuracy-related penalty based on negligence. Also, with regard to that determination, petitioners have failed to meet their burden of proof that they acted with reasonable cause and in good faith.

On this record, we find that petitioners have failed to demonstrate that they were not negligent and also have failed to show that they did not disregard applicable rules or regulations. They have not shown that there was reasonable cause for their underpayment or that they acted in good faith.

Accordingly, we sustain respondent's imposition of the accuracy-related penalty under section 6662(a) for 1997.

Reviewed and adopted as the report of the Small Tax Case Division.

<u>Decision will be entered</u>

<u>for respondent</u>.